W. G. INGLE AND WIFE, MRS. W. G. INGLE; B. W. FITCH AND WIFE,
MRS. B. W. FITCH, v. C. C. STUBBINS.

(Filed 4 June, 1954.)

**1. Deeds § 16b—**

In construing restrictive covenants in a deed, the meaning of each cove-
nant must be determined from a consideration of and in relation to the
other covenants in the instrument, giving each part its effect according to
the natural meaning of its language.

**2. Same—**

In construing restrictive covenants, each part of the contract must be
given effect if this can be done by fair and reasonable intendment, before
one clause may be construed as repugnant to or irreconcilable with another
clause.

**3. Same—**

Restrictive covenants must be strictly construed against limitation on
use, and be given effect as written, without enlargement by implication or
construction.

**4. Same—**

Mere sale of lots by reference to a recorded map raises no implied cove-
nant as to size of lots or against further subdivision.

**5. Same—Resubdivision of lots does not justify disregard of minimum set-
back lines as prescribed in restrictive covenant.**

The restrictive covenants running with the land involved in this suit
restricted the use of each lot to a single family dwelling, fixed mini-
mum size of each lot as to total area and width, and stipulated the mini-
mum setback lines of 50 feet on the front and 10 feet on the side. Two
lots facing a street at an intersection were resubdivided so as to form three
lots facing on the other street. The purchaser of the resubdivided lot at
the intersection began the erection of a dwelling, the site of which was
located nearer than the prescribed minimum distance from the street upon
which the lots originally faced. *Held:* While the restrictive covenants do
not preclude resubdivision so long as the covenants are complied with, re-
subdivision does not alter the covenants as to the original front and side
lines, and the location of defendant's residence nearer than 50 feet to the
street on which it originally fronted violates the covenants.

**6. Injunctions § 1b—**

While a mandatory injunction ordinarily will not issue as a preliminary
order, it is the proper remedy in apposite cases to compel compliance with
a judgment in the nature of an execution against a private person.

**7. Same: Deeds § 16b—Where defendant deliberately violates restrictive
covenants, mandatory injunction will lie to compel modification of
building to comply with restrictions.**

It appeared that defendant purchased his lot with knowledge of the
existence of restrictive covenants, that plaintiffs sought to restrain him
from erecting a dwelling in alleged violation of the restrictions, but that

the temporary order issued when only the foundations and subflooring had been completed was not renewed for plaintiffs' failure to give bond, and that pending the hearing on the merits, defendant completed the dwelling. *Held:* Upon determination that the dwelling violated restrictive covenants, plaintiffs are entitled to a mandatory injunction compelling defendant to remove the structure so that it conform to the covenants, and to prevent further construction of any building in violation of the covenants.

APPEALS by plaintiffs and by defendant from *Patton, S. J.,* January Civil Term 1954, of ALAMANCE.

Civil action to enjoin defendant from erecting a dwelling house upon a certain lot No. 11 in "Brookwood, Trollinger Section" in Burlington, N. C., in violation of restrictive covenants, and for mandatory injunction or for damages.

Upon trial in Superior Court the parties to this action, waiving a jury trial, submitted to the court an agreed statement of facts to which to apply the law, and to enter judgment in accordance therewith, etc. The facts agreed are substantially as follows:

1. During the month of September 1937 Mrs. Cora Trollinger subdivided a tract of land in Alamance County, then without and now within the corporate limits of the city of Burlington, N. C., into 61 lots and prepared a plat thereof, which was duly recorded in the office of the register of deeds of said county in Plat Book 2, at page 130, which plat is hereby by reference incorporated herein and made a part and parcel of the agreed statement of facts. Exhibit 1. (Note: The subdivision is known as "Brookwood-Trollinger Section.")

2. On 7 February, 1941, Mrs. Cora Trollinger and one W. Burton Hair and his wife, who had become the owners of lot No. 32 in said subdivision, made and executed a certain indenture, designated as Exhibit 2, which was duly recorded in office of register of deeds of Alamance County on 14 February, 1941, in Deed Book 133 at p. 113-114, the pertinent parts of which are these:

"Know all men by these presents, that Cora M. Trollinger, widow, and W. Burton Hair and wife, Virginia D. Hair, hereby covenant and agree to and with all persons, firms or corporations, now owning or hereafter acquiring any property in the area hereinafter described, that all of the lots shown upon the map of the property known as the Trollinger Section of Brookwood, as shown by plat recorded in the office of the register of deeds for Alamance County, North Carolina, in book of plats #2 at page 130, except lots numbered 44 to 46 inclusive, of said subdivision which are covered by different restrictions mentioned below, are hereby subjected to the following restrictions as to the use thereof, running with said properties by whomsoever owned, to wit:

"1. These covenants are to run with the land and shall be binding on all parties and all persons claiming under them until January 1, 1970.

"2. All lots in the tract of land above described shall be known as residential lots. No structures shall be erected, altered, placed, or permitted to remain on any residential building plot other than one detached single family dwelling not to exceed two and one-half stories in height and a private garage for not more than three cars and other outbuildings incidental to residential use.

"3. No building shall be located on any of lots numbered 29 to 34 inclusive nearer than 60 feet to the front line of said lots, nor nearer than 10 feet to any side street line; and no building, except a detached garage or other outbuilding located 100 feet or more from the front line shall be located nearer than 10 feet to any side lot line.

"4. No building on any of the other lots of the said subdivision shall be located nearer than 50 feet to the front line, nor nearer than 10 feet to any side street line; no building except a detached garage or other outbuilding located 100 feet or more from the front line shall be located nearer than 10 feet to any side lot line.

"5. No residential structure shall be erected or placed on any building plot, which plot has an area of less than 10,000 square feet, nor a width of less than 60 feet at the front building set back line. . . .

"8. No dwelling costing less than $4,000 shall be permitted on any lot in the tract."

3. Among the lots shown on said plat there were five lots designated as numbers 8, 9, 10, 11 and 12, all fronting on Bueno Street or Wildwood Lane,—8, and 9 were adjoining lots on the west side, and 10, 11 and 12 were adjoining lots on the east side thereof. Lot 9 was on the southwest corner and south of the intersection of Bueno Street or Wildwood Lane and Plaid Street. Lot 8 was located south of lot 9. And lot 10 was on the southeast corner of said intersection, and lot 11 adjoined lot 10 on the south, and lot 12 adjoined lot 11 on the south. Lot 10 had frontage of 100 feet on Bueno Street or Wildwood Lane, and extended easterly between parallel lines along the south line of Plaid Street 250 feet to lot 43, and then approximately south with the west line of lot 43. Lot 11 had frontage of 70 feet on Bueno Street or Wildwood Lane, and extended easterly to the west line of lot 42. And lot 12 had frontage of 68.1 feet, and extended easterly to west lines of lots 41 and 40.

4. Prior to 10 February, 1947, L. M. and G. M. Newlin, spelled also Newland, acquired lots 10 and 11 by mesne conveyance from Mrs. Trollinger, and on 10 February, 1947, purchased lots 8, 9 and 12 from her and obtained deeds therefor from her. Each of these deeds contained by reference the restricting covenants described in paragraph 2 hereinabove.

INGLE *v.* STUBBINS.

5. Thereafter L. M. and G. M. Newland subdivided lots 10 and 11 into three lots so that instead of facing on Bueno Street or Wildwood Lane, as shown on the original subdivision, they faced on south side of Plaid Street, as shown by an unrecorded diagram and plat hereto attached as a part hereof. The westerly lot has frontage of 90 feet, the center lot 80 feet, and the easterly lot 80 feet on Plaid Street,—and each extends across lots 10 and 11 to the north line of lot 12, as shown on original plat.

6. On 6 February, 1947 the Newlands conveyed the center of the three lots referred to in paragraph 5 to W. H. Brumble, by warranty deed without reference to restrictions; and on 11 March, 1947, they, the Newlands, conveyed the easterly lot to A. G. Solomon, by warranty deed containing the restrictive covenants, and on 5 August, 1947, they, the Newlands, conveyed the westerly lot to Clyde W. Cable, by warranty deed

containing the building restrictions, and on 10 September, 1951, Cable conveyed it to defendant C. C. Stubbins, by deed containing same reference to building restriction.

7. On 12 August, 1947, the Newlands conveyed parts of lots 8 and 9 to plaintiff B. W. Fitch and wife by warranty deed, containing the restrictive covenants.

8. On 31 October, 1949, the plaintiffs Wm. G. Ingle and wife obtained by *mesne* conveyance said lot 12. The deed to them contained no reference to restrictions. They have erected on this lot 12 a residence building, seventy-five (75) feet from their property line on Bueno Street or Wildwood Lane.

9. *As to Buildings on Lots 8, 9, 10 and 11.*

That before the plaintiff Ingle purchased his lot, as above stated, a residence, fronting on Plaid Street and less than 50 feet from Bueno Street, or Wildwood Lane, had been built upon a portion of lot 9. It is owned and occupied by one Hallsey.

Also prior to the date plaintiff Ingle acquired lot No. 12, a residence had been constructed on those parts of lots 10 and 11, referred to as the Brumble and Solomon lots, (see paragraph 6 hereinabove), but these residences are not nearer than 50 feet to Bueno Street or Wildwood Lane. They front on, and are 35 feet from Plaid Street.

And "upon lot 43 W. H. Moser has constructed a residence which does not set back on Central Avenue." (Note: Referring to the original plat —lot 43 fronts on E. Willowbrook Drive, and not on Central Avenue.)

10. Also lots 17 and 18, as shown on original plat and subdivision facing on Bueno Street or Wildwood Lane, and lots 33 and 34, facing East Willowbrook Drive, have been subsequently re-subdivided so that the rear portions of said lots have been formed into another lot facing on Central Avenue. (Note: The north lines of lots 17 and 34 as originally shown run with south line of Central Avenue.) And it is agreed that this re-subdivision of these lots was done and made after Mrs. Trollinger had sold the lots now owned by the parties hereto.

11. Exclusive of lots 10 and 11, there are nine vacant lots facing on Bueno Street or Wildwood Lane, and twenty-four in the whole subdivision.

12. Subsequent to the erection of a residence by plaintiff W. G. Ingle on lot 12, the defendant erected a dwelling house on a portion of lot 11 located 30.5 feet from Bueno Street or Wildwood Lane; that before defendant erected the house, he applied on 9 April, 1952, and obtained from the city of Burlington, a building permit, subject to this statement endorsed by the City Building Inspector, on the back of the application: "Permit 4276 is issued on the condition that it must meet the requirements of the Zoning Ordinance of the city . . . and the restrictions and

covenants on file for the Brookwood-Trollinger Section subdivision as recorded in Plat Book 2, page 130 and Deed Book 133 at pages 113-114, dated September 1937." That at the time of the issuance of the building permit "said lot, as re-subdivided faced on Plaid Street and the Building Inspector concluded that the placing of the house 50 feet from Plaid Street was a compliance with the regulations of the original restriction, as shown by the permit," which is made a part and parcel of the agreed statement. And the dwelling constructed on the front portion of lot 11, according to the original plot of said subdivision, is located 112 feet from Plaid Street. The size of the house is 32 x 26 feet. It is a modern house costing more than $5,000; and is so framed as to permit the cutting of a door into the side of the dwelling nearest to Bueno Street.

13. That at the time this action was instituted, 10 May, 1952, an order was issued to defendant to show cause a week later why he should not be enjoined from constructing this dwelling on lot 11 of the original subdivision. On that date the dwelling had been completed only to the extent of the foundation and sub-flooring; that defendant continued to construct the dwelling; that on return day the court signed a temporary order of injunction for one week; and defendant complied therewith. When the matter came on for later hearing upon application of plaintiff for a longer injunction, the court denied the injunction because plaintiffs were unable to furnish bond, but provided that the denial should be without prejudice to either party. After this order was entered, defendant continued the construction of said dwelling on lot 11, and completed the same pending this action. After doing so, and pending this action, defendant commenced to erect a structure 40 x 28 feet upon lot 10 of the original subdivision, 31 feet and 4 'inches from the front line of lot 10 on Bueno Street, and 50 feet from Plaid Street—completing the erection of foundation and foundation wall. Defendant discontinued the construction upon the issuance of a warrant pertaining thereto issued on basis of violation of the building code of the city of Burlington, and permit for construction of building on lot 10 has been vacated by the city.

14. That plaintiff Ingle and plaintiff Fitch each lives in houses on their lots, and defendant lives on the opposite corner in the same section of the town.

When the cause came on for hearing upon the agreed facts, the court being of opinion (1) that the restrictive covenants referred to are and were in full force and effect at the time of the institution of this action, (2) and that defendant has violated the restrictive covenant mentioned in paragraph four of the agreed statement of facts by placing buildings less than 50 feet from the front line of his lots, (3) and that plaintiffs have a right to maintain this action for a breach of said restrictive covenant, (4) and that plaintiffs are not entitled to relief by means of a

mandatory injunction, but are entitled to have damages, if any they have sustained, fixed by a jury, and that the cause should be returned to the trial docket of Alamance County for that purpose, entered judgment in accordance therewith.

To the signing and entering of the judgment (a) defendant excepts (Defendant's exception #1), and plaintiffs also except in so far as the judgment fails to grant injunctive relief in regard to lot 11 (Plaintiffs' Exception #1), and lot 10 (Plaintiffs' Exception #2) as prayed for in the complaint. Both parties appeal to Supreme Court and assign error.

*W. R. Dalton, Jr., for plaintiffs.*

*Thos. C. Carter and Clarence Ross for defendant.*

### DEFENDANT'S APPEAL.

WINBORNE, J. The sole question presented by the appeal of defendant, as stated in brief of attorneys filed in this Court for him, is whether or not the construction of the residence building on the lot in question nearer than fifty feet to Bueno Street or Wildwood Lane,—a fact agreed,—is in violation of the restrictive covenants here involved. The trial court ruled that it was violation of paragraph four. And this Court now approves.

The subject of restrictive covenants has been recently considered and treated by this Court in opinion by *Johnson, J.,* in the case of *Callahan v. Arenson,* 239 N.C. 619, 80 S.E. 2d 619. There the restrictive covenants are almost parallel in purpose and phraseology to those in the instant case. And they were considered in respect to a proposed plan for partial re-subdividing of four lots into smaller units.

It is there said (omitting citations), that "The applicable rules of interpretation require that the meaning of the contract be gathered from a study and a consideration of all the covenants contained in the instrument and not from detached portions . . . It is necessary that every essential part of the contract be considered,—each in its proper relation to the others,—in order to determine the meaning of each part as well as of the whole, and each part must be given effect according to the natural meaning of the words used . . . Another fundamental rule of construction applicable here requires that each part of the contract must be given effect, if that can be done by fair and reasonable intendment, before one clause may be construed as repugnant to or irreconcilable with another clause . . . Further, it is to be noted that we adhere to the rule that since these restrictive servitudes are in derogation of the free and unfettered use of land, covenants and agreements imposing them are to be strictly construed against limitations on use . . . Therefore, restrictive covenants clearly expressed may not be enlarged by implication or ex-

tended by construction. They must be given effect and enforced as written . . . Moreover, the rule is that the mere sale of lots by reference to a recorded map raises no implied covenant as to size or against further subdivision . . ." For rule as to interpretation, see also *Stephens v. Lisk, ante,* 289.

In the light of these rules of interpretation, we turn to the covenants now in hand, and parallel the reasoning and decision reached in the *Callahan case.*

The covenants that control decision here are contained in paragraphs 2, 4, 5 and 8 of the restrictive covenants.

Paragraph 2 designates the lots as residential lots, and restricts the use of the property to residential purposes, and provides that not more than one detached single family dwelling shall be placed on any residential building plot.

Paragraph 4 establishes the minimum building set back lines, both front and side. And this means the front and side as each existed at the time the covenant was made. See *Rhinehart v. Leitch,* 107 Conn. 400, 140 A. 763; *Tear v. Mosconi,* 239 Mich. 242, 214 N.W. 123.

Paragraph 5 fixes the minimum size of the building plot. The minimum requirements as to size are governed by two prescribed standards, one as to width, the other as to total area. The minimum width is 60 feet at the front building set back line. And the minimum area is 10,000 square feet. Therefore a lot 90 feet wide and 170 feet deep, the dimensions of the westerly lot of the re-subdivision of lots 10 and 11, exceeds the minimum standard so fixed as to width and size. But the area of the parts of said westerly lot within the lines of lots 10 and 11 respectively fail to meet the minimum standard of 10,000 feet so fixed. Hence, while the area of the westerly lot is adequate for a single family dwelling unit, it is not sufficient for two, and the erection of two-family dwelling units thereon would be and is in violation of the restrictive covenant in this respect.

Moreover, it is noted that the three lots into which lots 10 and 11, as shown on the original map, were subdivided each contains areas largely in excess of 10,000 square feet, and none of them is less than the minimum width. Therefore, as held in the *Callahan v. Arenson case,* the covenant fixing minimum standards as to width and area authorizes re-subdivision of the original lots 10 and 11 as made by the Newlands.

Nevertheless there is nothing in the covenants that authorizes the change of original front line in respect to requirements as to building set back distances. Indeed, in *Tear v. Mosconi, supra,* the Supreme Court of Michigan, in opinion by *Clark, J.,* said: "A builder may not treat the side line of the lot as a front line, and by so doing avoid the restrictions." Hence in case in hand, any building erected on the westerly lot of the re-

subdivision is required to be located not nearer than 50 feet to such orig-
inal front line, that is the east line of Bueno Street or Wildwood Lane,
or not nearer than 10 feet to the side street line—Plaid Street. And it
being admitted that the building proposed to be erected, and erected
pending this action, is located 30.5 feet from Bueno Street or Wildwood
Lane, such location of the building is in violation of the covenant fixing
the set back building line. Therefore, the ruling of the trial court so
holding is correct, and is hereby affirmed.

### PLAINTIFFS' APPEAL.

This appeal of plaintiffs challenges the correctness of the ruling of the
trial court in denying to them relief by mandatory injunction. The court
having found that defendant has violated the restrictive covenant as to
building set back line in the construction of a dwelling house within fifty
feet of Bueno Street or Wildwood Lane, as appears on defendant's appeal,
this Court, after considering the equities involved in the light of state-
ment of agreed facts, is constrained to hold that the denial of relief by
mandatory injunction is error.

"A mandatory injunction requires the party enjoined to do a positive
act, and since this may require him to destroy or to remove certain prop-
erty, which upon a final hearing he may be found to have the right to
retain, it is not so frequently used as a temporary or preliminary order.
As a rule such an order will not be made as a preliminary injunction,
except where the injury is immediate, pressing, irreparable and clearly
established, or the party has done a particular act in order to evade an
injunction which he knew has been or would be issued. As a final decree
in the case it would be issued as a writ to compel compliance in the nature
of an execution. The mandatory injunction is distinguished from a
*mandamus,* in that the former is an equitable remedy operating upon a
private person, while the latter is a legal writ to compel the performance
of an official duty." McIntosh's N. C. P. & P. in Civil Cases, Sec. 851,
p. 972; also *Clinard v. Lambeth,* 234 N.C. 410, 67 S.E. 2d 452; see also
*R. R. v. R. R.,* 237 N.C. 88, 74 S.E. 2d 430.

In 14 American Jurisprudence 672, we find this comprehensive state-
ment of pertinent case law: "Mandatory injunction has been frequently
granted to compel the removal of a building or a part thereof which has
been erected in violation of some restrictive covenant as to the use of
land. The issuance of a mandatory injunction to compel the removal of
a building erected in violation of a restrictive covenant depends upon the
equities between the parties. The most frequent use of mandatory injunc-
tion as a remedy for the violation of real property restrictions has been to
effect the removal of some erection which encroaches over a building line.
Unless the injury is so slight as to be within the maxim *'de minimis,'*

mandatory injunction will issue to compel removal of encroachments. In the case of one who deliberately violates a building restriction, a mandatory injunction to compel the modification of his building so as to comply with the restrictions cannot be avoided on the theory that the loss caused by it will be disproportionate to the good accomplished." See Annotations: 57 A.L.R. 336; 23 A.L.R. 2d 527.

Applying these principles to facts of case in hand, the defendant acquired the property with notice of the restrictions imposed upon lots 10 and 11 as originally platted. His attention was directed to these restrictions when he applied to the city for a building permit, and such permit was granted subject to the restrictive covenants. When he began the erection of building, plaintiffs sought in this action to enjoin him from proceeding. The court granted a temporary injunction which he obeyed. But when the plaintiffs could not furnish the bond required as condition for continuance of the injunction, defendant proceeded to take his chances as to the effect of his conduct upon plaintiffs' rights. Speaking to a like factual situation the Massachusetts Supreme Judicial Court in *Sterling Realty Co. v. Tredennick,* 162 A.L.R. 1095, 64 N.E. 2d 921, declared: "Upon similar facts it has been the practice of the courts to grant a mandatory injunction." While this statement of the principle is not binding on this Court, it is here appropriate, and is most persuasive. Hence, this Court holds that plaintiffs are entitled to mandatory injunction to require defendant to remove the building so that it shall not be nearer than fifty feet to Bueno Street or Wildwood Lane. Moreover, mandatory injunction is appropriate to prevent further construction of the building, foundation for which it appears has been laid by defendant.

Therefore, on plaintiffs' appeal the case will be remanded for further proceedings in accordance with this opinion, and as to justice appertains and the law directs.

On defendant's appeal—Affirmed.

On plaintiffs' appeal—Error and remanded.