CLAREMONT PROPERTY OWNERS ASSOCIATION, INC., Plaintiff v. W. STEPHEN GILBOY, JOAN GILBOY, R. MICHAEL GILBOY, and MYRON E. STEPPE, Defendants

No. COA00-1

(Filed 20 February 2001)

**Deeds— subdivision protective covenants—road maintenance fees—combined lots**

The trial court did not err by granting a declaratory judgment for plaintiff in an action to determine whether the purchaser of a subdivision lot which had been formed of two original lots was required by the subdivision protective covenants to pay road maintenance fees for one lot or two. The obligation to pay the road maintenance fees was a real covenant that ran with the land and the combining of the lots did not alter the real covenants that had previously attached to each lot; defendant was therefore

obligated to pay the fees for two lots. This is not to suggest that property may not be combined or re-subdivided for purposes of ownership or convenience, but, absent a provision to the contrary in the covenants, the property must always conform to the servitudes created by the covenants as they originally attached to the property.

Appeal by Defendants from judgment entered 30 August 1999 by Judge Dennis J. Winner in Henderson County Superior Court. Heard in the Court of Appeals 8 January 2001.

*Van Winkle, Buck, Wall, Starnes & Davis, P.A., by Michelle Rippon and Craig D. Justus, for Plaintiff-Appellee.*

*Prince, Youngblood & Massagee, by Sharon B. Alexander, for Defendants-Appellants.*

HUDSON, Judge.

Claremont Property Owners Association, Inc. (plaintiff) filed a complaint seeking a declaratory judgment as to the rights and restrictions established by the Protective Covenants for the Claremont Subdivision. The trial court entered a declaratory judgment in plaintiff's favor, and defendants appeal. We affirm.

I.

The pertinent facts in this case are undisputed. Defendants W. Stephen Gilboy, Joan Gilboy, and R. Michael Gilboy (the developers) sought to develop a subdivision on approximately 180 acres of land in Henderson County. On 30 April 1987, the developers executed and recorded Protective Covenants (the covenants) for the Claremont Subdivision (the subdivision). Paragraph 16A of the covenants provides that the cost of maintaining all of the roads within the subdivision will be divided by the number of lots, with the owner of each lot paying an equal pro rata share. Paragraph 16B states in pertinent part: "Each lot is hereby made subject to a specific and continuing lien to secure the payment of such charges, including interest thereon, and this lien shall run with the land and be enforceable notwithstanding any change of ownership of the lot." Paragraph 16 also provides that the developers will pay road maintenance fees on the same basis as any other lot owner for any lot that has not yet been sold. Finally, Paragraph 16D provides that the developers may assign to an association of the property owners "the right to maintain the subdivision

roads and to collect the costs thereof from the owners of the lots." In 1990, pursuant to this provision, the developers assigned these rights to plaintiff.

The developers developed the subdivision over a period of years in multiple phases, periodically recording plats depicting additional lots on the property. That the covenants contemplate a gradual development in multiple phases is borne out by a provision defining "Claremont Subdivision" as the property "shown on plats filed or to be filed," and by a provision declaring the covenants to be binding upon the property identified by "plats of Claremont Subdivision (whether now or hereafter recorded)." On 3 March 1993, and again on 5 January 1994, the developers recorded plats with the Henderson County Register of Deeds depicting Lots 109 and 110 as two separate lots situated side by side facing Claremont Drive. Subsequent to filing these plats, the developers paid road maintenance fees to plaintiff for Lots 109 and 110 individually. On 15 August 1995, these plats were amended by a plat which depicts Lot 120 as a combination of former Lots 109 and 110. However, despite combining the lots, the developers continued to pay two individual road maintenance fees for this property.

Lot 120 was then conveyed by the developers to defendant Myron Steppe on 13 March 1996. Since that time, plaintiff has attempted to assess and collect from Steppe road maintenance fees for two lots. However, Steppe has refused to pay fees for two lots, contending that he is obligated to pay fees for only one lot.

On 8 February 1999, plaintiff filed a complaint seeking a declaratory judgment as to (1) whether the developers have the right to combine previously platted lots in Claremont Subdivision for the purpose of reducing the annual road maintenance fees, and (2) whether the developers have the right to amend the covenants and to create new rights of way in the subdivision. The trial court's judgment, entered 30 August 1999, sets forth three conclusions "as a matter of law":

1. Although the Restrictive Covenants do not address the issue of whether or not after a lot is platted, the Developer without the permission of other land owners may combine two lots into one, and reduce the obligation to pay road assessments, it appears to the undersigned that the intention of the Developer at the time the restrictions were filed was to establish lots with obligations at the time of the filing and thereafter, to pay road assessments. Otherwise, he would not have contained the provision within the

restrictions by which the Developer himself pays the road assessments per lot until the lot is sold.

2. Purchasers of lots from the plats as filed had a right to assume that they would be paying a certain proportion of the road maintenance costs as shown by the plat, and to assume that the owners of each and every other lot on said plat would pay an equal sum pursuant to the plan of road maintenance as contained in the restrictive covenants.

3. Since lots had been sold from the plats enumerating Lots 109 and 110 as separate lots prior to the amended plat combining them, it would be inequitable to the purchasers of other lots to allow the road assessments for Lots 109 and 110 to be reduced without their permission.

We note that the trial court's judgment does not address the developers' right to amend the covenants, and defendants do not assign error to the trial court's failure to address this issue. Thus, although the law is clear on this issue, see *Smith v. Butler Mtn. Estates Property Owners Assoc.*, 324 N.C. 80, 85, 375 S.E.2d 905, 908 (1989) (holding that, in the absence of a provision in the covenants to the contrary, restrictive covenants running with the land in a subdivision may be modified or repealed only by a release or agreement executed by all of the property owners in the subdivision), the issue is not before us on appeal, see N.C.R. App. P. 10(a).

## II.

On appeal, defendants do not assign error to the six findings in the judgment denominated factual findings by the trial court. Defendants' assignments of error pertain only to the three findings denominated conclusions of law recited above. However, the trial court's first purported conclusion of law is a finding as to the intent of the developers with regard to the covenants. Our Supreme Court has held that when the language of an instrument is ambiguous, and when the effect of the instrument must be resolved by determining the intent of the parties, the question of the parties' intent is one of fact to be determined by the court. See *Runyon v. Paley*, 331 N.C. 293, 305, 416 S.E.2d 177, 186 (1992). Thus, although denominated a legal conclusion, the trial court's finding pertaining to the developers' intent is actually a finding of fact. Therefore, we must determine (1) whether this challenged finding of fact is supported by any competent evidence, and (2) whether the remaining legal conclusions are

supported by the factual findings. *See, e.g., Smith v. Butler Mtn. Estates Property Owners Assoc.*, 90 N.C. App. 40, 43, 367 S.E.2d 401, 405 (1988), *aff'd*, 324 N.C. 80, 375 S.E.2d 905 (1989).

### III.

The issue in the instant case is whether Steppe, having purchased Lot 120, which is a combination of Lots 109 and 110, is required by the covenants to pay road maintenance fees for one lot or two. Our Supreme Court has explained in considerable detail the applicable principles where restrictive covenants are imposed upon individual lots in a subdivision:

> [T]he principle upon which these restrictive burdens on the use of lands within a real estate subdivision are enforceable is that they are servitudes imposed on the various lots or parcels for the benefit of the area affected. . . . These servitudes . . . are usually imposed by restrictive covenants between the developer and the initial purchasers and become seated in the chain of title . . . thus fixing it so each lot in a legal sense owes to all the rest of the lots in the subdivision the burden of observing the covenant, and each of the rest of the lots is invested with the benefits imposed by the burdens. Accordingly, in legal contemplation the servitude imposed on each lot runs to and attaches itself to each of the rest of the lots in the restricted area, thus forming a network of cross-easements or cross-servitudes, the aggregate effect of which is to impose and confer on each lot reciprocal and mutual burdens and benefits appurtenant to the lots, so as to run with the land and follow each lot upon its devolution and transfer. Therefore, where land within a given area is developed in accordance with a general plan or uniform scheme of restriction, ordinarily any one purchasing in reliance on such restriction may sue and enforce the restriction against any other lot owner taking with record notice, and this is so regardless of when each purchased; and similarly, a prior taker may sue a latter taker.

*Craven County v. Trust Co.*, 237 N.C. 502, 512-13, 75 S.E.2d 620, 628 (1953) (citations omitted).

The covenant at issue is an affirmative obligation to pay road maintenance fees. An affirmative obligation to pay assessments is considered to be a real covenant, or servitude, that runs with the land where: (1) the instrument creating the covenants reveals such an intent; (2) there is privity of estate between the party enforcing the

covenant and the party against whom the covenant is being enforced; and (3) the assessments are for the maintenance of property that is located within the subdivision for the benefit of the lot owners. *See Homeowners Assoc. v. Sellers and Homeowners Assoc. v. Simpson,* 62 N.C. App. 205, 210-11, 302 S.E.2d 848, 852-53, *cert. denied,* 309 N.C. 461, 307 S.E.2d 364 (1983). There is no dispute in the instant case as to the existence of these three elements. Thus, the affirmative obligation to pay road maintenance fees is clearly a real covenant that runs with the land. As the Supreme Court explained in *Craven County,* servitudes imposed by restrictive covenants on a subdivision that is "developed in accordance with a general plan or uniform scheme of restriction" run with the land and attach to each lot in the subdivision individually, forming a network of "cross-servitudes." *Craven County,* 237 N.C. at 513, 75 S.E.2d at 628. We believe the affirmative obligation to pay road maintenance fees in the instant case is a real covenant that attached to Lots 109 and 110 individually upon the filing of the original plat establishing these lots. Furthermore, we believe the act of combining Lots 109 and 110 to form Lot 120 did not alter or negate the real covenants that had previously attached to each lot. Therefore, despite the fact that the property was conveyed to Steppe as a single lot, it remains subject to an obligation to pay road maintenance fees as if it were two lots.

The holding in *Ingle v. Stubbins,* 240 N.C. 382, 82 S.E.2d 388 (1954), supports this conclusion. In *Ingle,* the restrictive covenants of a subdivision prohibited any building on a particular lot from being located nearer that 50 feet from the "front line" of that lot, or nearer than 10 feet from the "side street line" of that lot. *Id.* at 384, 82 S.E.2d at 390. Lots 10 and 11 were originally platted as adjacent, rectangular lots, with front lines on the western boundary of the property facing Bueno Street, which was considered a main street and which ran north and south. *See id.* Lot 10 was directly north of Lot 11, and was situated on the corner of Bueno Street and Plaid Street. *See id.* Thus, the northern side of Lot 10 faced Plaid Street, which was considered a side street and which ran east and west.

The owner of Lots 10 and 11 re-divided the property to form three adjacent, rectangular lots, facing the northern boundary of the property and Plaid Street. *See id.* at 385, 82 S.E.2d at 390-91. The defendant purchased the most westerly of the three lots on the corner of Bueno and Plaid Streets and began to construct a house facing Plaid Street. *See id.* at 386, 82 S.E.2d at 392. The front of the defendant's house was to be 50 feet from Plaid Street, and the side was to be 31

feet from Bueno Street. *See id.* at 387, 82 S.E.2d at 393. Thus, what had once been considered the "front line" of the property was now being used by the defendant as the side line of the property, and vice versa.

The plaintiffs, who owned Lot 12, situated directly south of what had previously been Lot 11, instituted an action to enjoin the defendant from building the house, contending that the house would violate the restrictive covenants. The Court held that the restrictive covenants established the minimum building set-back lines for both "front" and "side" lines, and that these terms were to be interpreted as referring to the "front" and "side" lines as each existed at the time the restrictive covenants were executed. *Id.* at 389, 82 S.E.2d at 394. Thus, the Court concluded that the defendant's building would violate the covenants because the side of the building would be less than 50 feet from what was originally considered the "front" line of the property. *Id.* at 389-90, 82 S.E.2d at 395.

From the Court's holding in *Ingle*, we derive two principles. First, the servitudes imposed by the restrictive covenants of a subdivision attach to each individual lot at the moment the subdivision becomes subject to the covenants. This may occur upon the execution of the covenants if the subdivision is already complete, or, as in the instant case, it may occur upon the filing of a new plat of lots if the plat is intended to be subject to covenants already in existence.

Second, any ambiguous terms in the covenants must be interpreted according to what they meant at the time the servitudes attached to the individual lots. Thus, Paragraph 16A, which provides that "[t]he maintenance cost paid by the owner of each lot, for that lot, shall be the total cost of maintenance of said roads divided by the total number of lots served by said roads," must be interpreted according to what the term "lot" meant at the time the property became subject to the covenants. At that time, the division of lots on the original plat depicted Lots 109 and 110 as two individual lots. Therefore, the servitudes in the covenants, including the obligation to pay road maintenance fees, attached to Lots 109 and 110 individually. This is not to suggest that lots may not be combined or re-subdivided. As in *Ingle*, the property may be combined or re-subdivided into different lots for purposes of ownership or convenience, but, absent a provision in the covenants to the contrary, the property must always conform to the servitudes created by the covenants as they originally attached to the property. *See Callaham v. Arenson*, 239 N.C. 619, 80 S.E.2d 619 (1954) (holding that the owner of four lots in a subdivision

could re-subdivide the property into eight lots provided that the property continued to conform to the restrictive covenants).

Furthermore, the extrinsic evidence tends to support the trial court's finding that the developers intended to fix the lot divisions according to the original plat for purposes of applying the covenants. Where restrictive covenants are ambiguous, their meaning must be construed by determining the intent of the parties, and the intent of the parties must be gathered from an examination of all the covenants contained in the instrument as well as an examination of the surrounding circumstances. *See Long v. Branham*, 271 N.C. 264, 268, 156 S.E.2d 235, 238-39 (1967).

The other restrictions set forth in the covenants support the conclusion that although the developers intended to allow the combining of lots, they also intended that the road maintenance fee obligation would attach to each lot upon creation of the lot by recorded plat, and that the combining of lots would not alter these fee obligations. Paragraph 2D expressly allows the owner of two or more adjoining lots to combine the lots in order to satisfy the three acre requirement for erecting a guest house pursuant to Paragraph 2B. The covenants do not contain an analogous provision allowing lot owners to combine lots to reduce road maintenance fees. Furthermore, Paragraph 16A provides that the developers shall pay road maintenance fees on the same basis as any other lot owner so long as they own any lots in the subdivision. Thus, if the subdivision contained 100 lots, with 90 lots already purchased by individual owners and 10 still owned by the developers, paragraph 16A would require the developers to pay approximately one tenth of the total road maintenance costs. If, however, an owner were allowed to combine multiple lots to form a single lot for purposes of calculating road maintenance fees, the developers could, in this hypothetical situation, combine the 10 lots to form one single lot, and, as a result, pay a significantly smaller fraction of the total costs. That such a result would undermine the intended scheme for paying road maintenance fees is obvious. This supports the conclusion that the system created by the covenants does not contemplate treating property resulting from the combination of multiple lots as a single lot for purposes of calculating road maintenance fees.

In addition to examining the covenants themselves, intent may be gleaned from actions undertaken by the developers, both prior to and subsequent to the execution of the covenants. *See id.* at 274, 156

S.E.2d at 243 (holding that developers' intent to prohibit the building of additional roads over lots in a subdivision could be inferred from the fact that developers believed it was necessary to amend the covenants to allow for the building of a particular road over a particular lot). In the instant case, the developers continued to pay road maintenance fees for two lots subsequent to combining Lots 109 and 110 and prior to the conveyance of Lot 120 to Steppe. Thus, it appears the developers believed that, despite combining two lots into one, the road maintenance fees were to be assessed according to the division of lots as established by the original plat.

For the reasons set forth herein, we hold that there is competent evidence in the record to support the trial court's finding that "the intention of the Developer at the time the restrictions were filed was to establish lots with obligations at the time of the filing and thereafter, to pay road assessments." Furthermore, we hold that the findings support the legal conclusion that road maintenance costs should be calculated according to the division of lots appearing in the original plat, and that defendant Steppe is, therefore, obligated to pay road maintenance fees for two lots.

Affirmed.

Chief Judge EAGLES and Judge SMITH concur.