985 P.2d 1045

Angelo PELOSI, Plaintiff/Counterclaim Defendant–Petitioner/Respondent–Appellant,

v.

WAILEA RANCH ESTATES, a Hawai'i general partnership, John Kean, Stephen Pitt, Satish Gholkar, Eduardo F. Bello, Hugh Jeffrey Farrington and Stephen K. Rink, Deceased, Defendants–Respondents–Appellees, Stephen M. Swanson, Louise S. Swanson, Margaret S. Smith, Batte T.L. Smith, Nahbut L. Smith, Peter Tucker, Lynne Coleman Tucker, Marc O. Yoshizumi, Davis Roland King, Dorian Keyes King, Dennis Rush, Cindy Rush, O'Green Estate, Bob Nick Oosterveen, Diane Oosterveen, Jane Greenspun, Ronald G. Mann, Edna Joan Mann, Stephen Fowler Chadwick, Annice Buckner Chadwick, Gerald K. Wong and Chu Il Wong, Defendants/Counterclaimants–Petitioners/Respondents–Appellees, Tina Sohn, individually and as Personal Representative of the Estate of Robert C. Sohn, Deceased, Defendant–Respondent–Appellee.

No. 20254.

Supreme Court of Hawai'i.

July 8, 1999.

Reconsideration Denied July 26, 1999.

Kevin H.S. Yuen, on the briefs, Wailuku, for the plaintiff/counterclaim defendant-petitioner/respondent-appellant Angelo Pelosi.

Wilson M.N. Loo and Steven B. Jacobson (of Torkildson, Katz, Fonseca, Jaffe, Moore & Hetherington), on the briefs, Honolulu, for the defendants/counterclaimants-petitioners/respondents-appellees Stephen M. Swanson, Louise S. Swanson, Margaret S. Smith, Batte T. L. Smith, Nahbut L. Smith, Peter Tucker, Marc O. Yoshizumi, Davis Roland King, Dorian Keyes King, Dennis Rush, Cindy Rush, O'Green Estate, Bob Nick Oosterveen, Diane Oosterveen, Jane Greenspun, Ronald G. Mann, Edna Joan Mann, Stephen Fowler Chadwick, Annice Buckner Chadwick, Gerald K. Wong, Chu Il Wong; and defendant-respondent-appellee Tina Sohn.

Gary Robert, on the briefs, Lahaina, for the defendants-respondents-appellees Wailea Ranch Estates, John Kean, Stephen Pitt, Satish Gholkar, Eduardo F. Bello, Hugh Jeffrey Farrington and Stephen K. Rink.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

### Opinion of the Court by LEVINSON, J.

On April 7, 1999, we granted the applications of both the plaintiff-petitioner/respondent-appellant Angelo Pelosi and the defendants-petitioners/respondents-appellees Stephen M. Swanson, Louise S. Swanson, Margaret S. Smith, Batte T. L. Smith, Nahbut L. Smith, Peter Tucker, Marc O. Yoshizumi, Davis Roland King, Dorian Keyes King, Dennis Rush, Cindy Rush, O'Green Estate, Bob Nick Oosterveen, Diane Oosterveen, Jane Greenspun, Ronald G. Mann, Edna Joan Mann, Stephen Fowler Chadwick, Annice Buckner Chadwick, Gerald K. Wong, Chu Il Wong, and Tina Sohn (collectively, "the individual defendants") for a writ of certiorari to clarify the opinion of the Intermediate Court of Appeals (ICA) in *Pelosi v. Wailea Ranch Estates,* 91 Hawai'i 522, 985 P.2d 1089 (App.1999) (hereinafter, the "ICA's majority opinion" or "*Pelosi II* ").

In his application, Pelosi argues that the ICA majority erred in concluding that: (1) a balancing of the relative hardships was necessary to determine whether a mandatory injunction should have been issued; (2) Pelosi was barred by the doctrine of laches from obtaining mandatory injunctive relief to remove a roadway; and (3) the circuit court was correct in not allowing Pelosi to adduce additional evidence subsequent to trial. In their application, the individual defendants argue that the ICA majority erred in: (1) concluding, in its opinion in *Pelosi v. Wailea Ranch Estates,* 10 Haw.App. 424, 876 P.2d 1320, *cert. denied,* 77 Hawai'i 373, 884 P.2d 1149 (1994) (hereinafter, "*Pelosi I* "), that tennis courts are "buildings" for the purposes of a restrictive covenant; (2) failing to apply the defense of laches to Pelosi's claims regarding the tennis court; (3) failing to properly balance the equities involved in enforcing the covenant; (4) granting a mandatory injunction even though Pelosi had already been awarded damages; and (5) granting equitable relief although the covenant had lost its beneficial value.

We agree with Pelosi's point of error (2) and with the individual defendants' point of error (3); however, the ICA's errors in these instances did not lead to an incorrect result. We therefore offer the following discussion for the purpose of clarifying the points of law discussed in the ICA's majority opinion. The remaining points of error are without merit. Accordingly, we affirm the ICA's majority opinion in all other respects.

### I. BACKGROUND

#### A. Lot 29

On October 26, 1977, Pelosi purchased Lot 28 of the Maui Meadows Unit III (MM III) Subdivision in Kihei, Maui. Since 1981, Pelosi has resided continuously on Lot 28. Adjoining Pelosi's lot is Lot 29, which is the focus of present dispute.

All of the "houselots" in the MM III subdivision are subject to a restrictive covenant,[1] which, according to its terms, "run[s] with

---

1. The covenant describes the MM III subdivision as consisting of "273 houselots and fifteen road-way parcels[.]" The roadway parcels are exempt from the restrictions of the covenant.

the land" and is "binding upon and inure[s] to the benefit of the present owners of said lands and upon and to all subsequent owners of said lands[.]" The MM III covenant serves the purpose "of establishing and insuring a sound and proper subdivision for residential purposes." The covenant further provides in relevant part: "No lot shall be used except for *residential* purposes. No building shall be erected, placed, or permitted to remain on any lot other than a single family dwelling not to exceed one and one-half stories in height and any accessory buildings." (Emphasis added.)

On August 26, 1986, Wailea Ranch Estates, a Hawai'i general partnership whose partners are John Kean, Stephen Pitt, Satish Gholkar, Eduardo F. Bello, Hugh Jeffrey Farrington, and Stephen K. Rink (the partnership and partners will hereinafter be collectively referred to as "WRE"), purchased property north of and bordering the MM III subdivision. WRE also purchased Lot 29. The deed for the conveyance of Lot 29 contained an express reference to the MM III restrictive covenant. The property purchased by WRE comprised approximately 20.5 acres. WRE proceeded to subdivide the 20.5 acres into nine two-acre lots and three roadway lots. One of the roadway lots included a portion of Lot 29.

Also in August 1986, WRE entered into a "Farm Dwelling Agreement" with the County of Maui ("the county"), which provided that any dwelling built on the 20.5 acres must be a "farm dwelling," occupied by a family "deriv[ing] income from the agricultural activity on the parcel." Nonetheless, WRE chose to develop the 20.5 acres as an "exclusive, large lot subdivision," to be called "Wailea Ranch Estates" ("Wailea Ranch"), a "world-class community for those who seek out excellence and enduring value with the same single-mindedness that they apply to their successful careers and their leisure time." WRE's marketing materials offered, *inter alia,* a "common area Tennis Court with parking [that] shall be available for the exclusive use of the homeowners of 'Wailea Ranch Estates' and their guests." A tennis court was not, however, included on the original subdivision map.

For the purpose of performing construction work on its 20.5 acres, WRE obtained oral permission to utilize a fire break road on the property of Ulupalakua Ranch. WRE never had any interest in the fire break road, however, nor did it obtain permission to use the road indefinitely.

In the second half of 1987, WRE began construction on Lot 29. A road was constructed on Lot 29, which Pelosi "figured they [were] using ... as a way to do some work" on the subdivision. In late 1987, Lot 29 was elevated. The road was paved in late 1987 or early 1988. Pelosi testified that in late 1987, he telephoned Bello and asked him "what was going on." Bello delivered a copy of WRE's marketing materials—which mentioned the planned tennis courts, but not their location—to Pelosi. The map accompanying the materials showed roadway access through Lot 29, but did not specify the type of access that Lot 29 would provide.

Pelosi testified that in late 1987, he protested to the construction workers and the county regarding the work being done on Lot 29. He further testified that in October or November 1987, he met with Kean, Farrington, and Rink, WRE's attorney. Pelosi testified that when he asked what the roadway was for, he was told, "it's just a private driveway." He also testified that the three developers told him that they were "considering" a tennis court, and that, when he protested that a tennis court would violate the MM III covenant, the developers denied that their actions would be in violation of the covenant. On November 10, 1987, Pelosi sent a letter to Kenneth Cohen of the Land Use and Codes Administration of the county to express his concerns. Pelosi also called the county to ask about the possible tennis court and was told that the county knew nothing about it.

Pelosi testified that at the end of 1987 or beginning of 1988, once the roadway was paved, construction of walls began on Lot 29. Pelosi testified that he did not learn until the spring of 1988 that there was going to be a tennis court on Lot 29. He learned of the planned tennis court through a series of let-

ters and phone calls with the county.[2] A letter from Rink to the county indicated that, as of April 8, 1988, the walls had been completed, but the tennis court had not yet been constructed.

On May 18, 1988, Pelosi's attorney sent a letter regarding the use of Lot 29 to Rink. The letter read in relevant part:

> Paragraph (1) of the Maui Meadows Restrictive Covenants provides that "No lot shall be used except for residential purposes." Obviously Lot 29 is not being used by your client for residential purposes[,] but for a roadway to service its subdivision. The use of the lot in this fashion not only violates the Maui Meadows covenants but constitutes an offensive nuisance in its own right. The idea that your client would in addition erect a tennis court on the property simply aggravates its violation of the covenants and its creation of a nuisance in a residential neighborhood.

The tennis court was completed in the summer of 1988. On August 10, 1988, Pelosi's attorney sent another letter to Rink, advising him that if the roadway and tennis court were not removed from Lot 29, Pelosi would file a complaint.

During the construction of the roadway and tennis court on Lot 29, WRE began to sell the lots of Wailea Ranch. WRE sold the first parcel to two of the individual defendants on April 15, 1988. Three of the individual defendants purchased parcels in June 1988, and two more purchased parcels in July 1988. The rest of the individual defendants purchased parcels of Wailea Ranch after construction of the roadway and tennis court was complete.

### B. *Procedural History*

#### 1. *Pelosi I*

On August 26, 1988, Pelosi filed the complaint against WRE and Doe defendants that gave rise to the present appeal. The complaint alleged that: (1) WRE had breached the MM III restrictive covenant; (2) the building of a tennis court and roadway caused a nuisance; and (3) the tennis court and roadway posed a threat of irreparable harm to Pelosi. Pelosi alleged that he suffered and would continue to suffer from physical, mental, and emotional distress, as well as a diminution in value of Lot 28. Pelosi prayed for (1) general, special, and consequential damages, in an amount to be proven at trial, (2) punitive damages in a sum not less than $500,000.00, (3) declaratory relief that WRE's use of Lot 29 was not "for residential purposes," (4) a preliminary injunction prohibiting the further use of Lot 29 as a roadway and a tennis court, and (5) a permanent injunction prohibiting the use of Lot 29 for a roadway and tennis court.

WRE filed an answer on September 22, 1988. On April 17, 1989, Pelosi moved for certification of the individual defendants, the individual lot owners of Wailea Ranch who owned an undivided interest in Lot 29 (hereinafter, WRE and the individual defendants will be referred to collectively as "the defendants").[3] On May 26, 1989, the individual defendants filed an answer and counterclaim.[4]

Trial of the case commenced on September 24, 1990. The jury found that the defendants[5] were using Lot 29 for residential

---

2. The county had told Pelosi in late 1987 or early 1988 that Lot 29 would be used only for access and utility purposes. In a letter dated April 8, 1988, the county informed Rink that "construction of a tennis court is not allowed" on Lot 29. Subsequently, the county consulted with counsel and determined that the construction of a tennis court on Lot 29 would be permissible.

3. Two of the individual defendants, Tina Sohn and Robert C. Sohn, were not added as defendants until June 23, 1995.

4. The individual defendants alleged that: (1) Pelosi had built a two-story house on Lot 28, in

violation of the MM III covenant; (2) Pelosi's institution of the lawsuit was malicious and in bad faith; and (3) Pelosi's institution of civil proceedings interfered with the individual defendants' contractual relationships and prospective economic advantages. The circuit court entered an order dismissing the second allegation on July 25, 1990, and entered judgment for Pelosi and against the individual defendants on August 23, 1990.

5. The circuit court and ICA in *Pelosi I* did not distinguish, in the relevant orders, judgments, and opinion, between the WRE defendants and the individual defendants. In fact, this distinc-

purposes, but that, inasmuch as the defendants' use of Lot 29 constituted a nuisance to Pelosi, Pelosi was entitled to $20,000.00 in damages.[6] Following entry of judgment by the circuit court, Pelosi filed a notice of appeal.

In *Pelosi I*, the ICA concluded that

the clear and unambiguous terms of the MM III Covenants, construed in accordance with their plain, ordinary, and accepted meanings, lead to but one conclusion: only one single-family dwelling and such buildings as are strictly accessory to the use of that dwelling may be constructed on an MM III houselot. Since Lot 29 contains no single-family dwelling, and the roadway and tennis court on Lot 29 are accessory to residences in a completely different subdivision, the restrictive covenant was clearly breached.[7]

10 Haw.App. at 437, 876 P.2d at 1327. The ICA remanded the case to the circuit court "to determine whether mandatory injunctive relief or other damages should be granted to [Pelosi] as a result of WRE's breach of the MM III Covenants." *Id.* at 447, 876 P.2d at 1331. More specifically, the ICA instructed:

If the trial court determines that Defendants deliberately and intentionally violated the MM III Covenants or intentionally assumed the risk of such violation, a mandatory injunction should issue forthwith, ordering Defendants to remove the roadway and tennis court on Lot 29.

If, on the other hand, the trial court determines that Defendants did not intentionally violate the MM III Covenants or intentionally assume the risk of such violation, then *the trial court may balance the equities* in determining whether to grant injunctive relief by ordering removal of the roadway and/or tennis court. If the trial court concludes that the relative hardships to the parties preclude an award of injunctive relief, then the trial court shall hold a

hearing to determine whether [Pelosi] is entitled to damages resulting from Defendants' breach of the MM III Covenants which are in addition to the $20,000 in damages already awarded to him for his nuisance cause of action.

*Id.* (emphasis added).

### 2. *Pelosi II*

On July 14, 1995, the circuit court heard Pelosi's motion for entry of mandatory injunction. On August 24, 1995, the circuit court entered "Findings On Issues Submitted By The Intermediate Court of Appeals." The court entered the following relevant findings of fact:

Question No. 1. Whether defendants deliberately and intentionally violated MM III Covenants? No.

Question No. 2. Whether defendant[s] intentionally assumed the risk of such violation? No.

Question No. 3 In balancing the equities should the court grant injunctive relief by ordering removal of the roadway and/or tennis court? No.

Question No. 4. What, if any, damages should be assessed [against] the defendants? Further hearing is necessary.

The pertinent facts of this case are as follows:

. . . .

3) Without Lot 29 as access to [Wailea Ranch], no approval could have been given by the County.

4) No other access is available and by necessity, Lot 29 was included as part of [Wailea Ranch].

5) Defendants purchased the property with subdivision and development as their purpose and would have had no reason to do so if no subdivision or development were possible or permissible.

. . . .

---

tion was not expressly drawn until the ICA's majority opinion in *Pelosi II*.

6. The jury also found, with regard to the last surviving allegation of the individual defendants' counterclaim, that Pelosi did not interfere with the defendants' contracts.

7. In her present appeal, Sohn argues that, inasmuch as the Sohns "were not parties to the first appeal herein, in which the ICA first ruled that the tennis court violated the MM III covenants[,] . . . [Sohn] cannot in any way be bound by that ruling." We agree, however, with the ICA's analysis in *Pelosi I*, 10 Haw.App. at 435–37, 876 P.2d at 1326–27.

7) The County of Maui had no objection to and indeed permitted the construction of a tennis court and road on Lot 29.

8) Roads and tennis courts exist in the Maui Meadows subdivisions. Although the restrictive covenants are not County or state laws and are to be considered separately and individually, considering the milieu of governmental regulations, real estate practice, construction and comparable uses, defendants' decision to proceed with a tennis court and road on Lot 29 cannot be found to have been deliberate and intentional violations of the MM III covenants.

9) Indeed, it would appear that the defendants' expertise in law, construction, real estate development, and architecture gave credence to their conclusions as to the proper interpretation of the restrictive covenants and not necessarily that they should have known better.

10) The finding by a jury of their peers that the defendants were not using Lot 29 for residential purposes would seem to have confirmed the defendants' and their experts' opinions in interpreting the use of Lot 29.

11) [Pelosi] is ... an experienced and practicing real estate person, and was living adjacent to the defendants['] development with a clear observation as to the progress of the construction. He had the opportunity to determine from the instigation of the defendants['] plans in 1986 whether to involve himself but expressed no objections until the spring of 1988. Even if [Pelosi's] version were accepted, construction on Lot 29 was substantially completed by July 1987[,] way before [Pelosi] alleges he met with defendants in late 1987 and warned defendants.

12) Since 1986, development has not been enjoined or delayed and additional party defendants have been added who have purchased lots and/or built upon them. The Wailea Ranch Estates may no longer exist as the original entity it once was.

13) Subjecting the defendants as well as subsequent innocent purchase[r]s to the injunctive relief sought by [Pelosi] would create substantial hardship on their part by effectively terminating access to the subdivision and thereby creating an illegal subdivision.

The trial court also entered the following conclusions of law:

1) Since defendants did not deliberately or intentionally violate [the] MM III Covenants, injunctive relief is not appropriate.

2) Since defendants did not assume the risk of violating the MM III Covenants, injunctive relief is not appropriate.

3) Since in balancing the equities, the injunctive relief of removal of the road and/or tennis court would not serve justice, injunctive relief is not appropriate.

4) A hearing on damages resulting from defendants' breach of [the] MM III Covenants in addition to the $20,000 already awarded for nuisance is warranted.

On October 27, 1995, Pelosi filed a motion "for leave to present additional testimony on whether or not access other than Lot 29 is available to Defendant[ ]s['] subdivision." In support of his motion, Pelosi attached the affidavit and report of a civil engineer who stated that an existing fire break road could be upgraded to a residential access roadway for Wailea Ranch. The circuit court denied Pelosi's motion on November 24, 1995.

On April 18, 1996, the circuit court held a one-day proof hearing to determine whether Pelosi was entitled to damages for the diminution in value to his property. On June 25, 1996, the circuit court entered findings of fact and conclusions of law regarding Pelosi's entitlement to damages. The circuit court first ruled that, inasmuch as it had previously concluded that the defendants' breach of the MM III covenant was not willful or intentional, Pelosi's "alleged past and future emotional and physical damages are not relevant to the proper measure of damages in this breach of restrictive covenant case." The circuit court further concluded that Pelosi "did not establish by any credible evidence that the uses complained of ... after the time of the breach of the MM III covenant were of such a material nature as to have caused [Pelosi]

damages."[8] Accordingly, the circuit court awarded Pelosi $2.00 in nominal damages. On September 27, 1996, the circuit court entered an amended judgment, granting nominal damages to Pelosi and denying Pelosi's request for a mandatory injunction.[9] Pelosi filed a notice of appeal on December 19, 1996.

On May 1, 1998, the ICA filed a memorandum opinion that concluded that "the trial court should have issued a mandatory injunction, requiring the removal of the roadway and tennis court on Lot 29." The defendants filed timely applications for certiorari. This court held that two of the defendants, the Sohns, had not received proper service of documents on appeal, and remanded the appeal to the ICA "for reconsideration in light of the Sohns' answering brief and Pelosi's reply."

Following remand, the ICA's majority opinion affirmed the circuit court's denial of mandatory injunctive relief to Pelosi regarding the removal of the roadway of Lot 29, but concluded that Pelosi was entitled to a mandatory injunction ordering the removal of the tennis court from Lot 29. *Pelosi II* at 534, 985 P.2d at 1101. The ICA majority based its decision on the determination, drawn from the supreme court's analysis in *Sandstrom v. Larsen*, 59 Haw. 491, 583 P.2d 971 (1978), that mandatory injunctive relief must be granted as the remedy for a violation of a restrictive covenant if two requirements are met: "(1) the defendant had actual or constructive knowledge of the restrictive covenant; and (2) despite such knowledge, the defendant deliberately and intentionally proceeded with construction violative of the covenant or intentionally assumed the risk of violating the covenant without first obtaining a resolution of the covenant." *Pelosi II* at 528, 985 P.2d at 1095.

The ICA majority observed that "the record *overwhelmingly* indicates that the WRE Defendants" satisfied both parts of the two-prong test. *Id.* at 528, 985 P.2d at 1095 (emphasis added). The ICA majority expressed concern, however, that "[a]lthough the Individual Defendants presumably had at least constructive notice of the restrictive covenant at issue,[10] there is no evidence that they participated in any way in the construction of the roadway or tennis court that were in violation of the restrictive covenant." *Id.* at 530, 985 P.2d at 1097. The ICA majority characterized the individual defendants as "innocent purchasers" and weighed the "relative hardships" to the parties to determine whether injunctive relief should issue. *Id.* at 532, 985 P.2d at 1099.

Applying the relative hardship analysis, the ICA majority determined that,

> [s]ince Pelosi waited until May 1988 to formally request that the WRE Defendants remove the roadway and until August 1988 to file the instant action, we cannot conclude that the circuit court erred when it considered Pelosi's delay, balanced the equities, determined that closing up the roadway would deprive the Individual Defendants of access to the WRE Subdivision and create too much of a hardship on them, and consequently, declined to award Pelosi mandatory injunctive relief.

*Id.* at 533, 985 P.2d at 1100. On the other hand, the ICA majority observed that, given the "clear evidence[,] ... we cannot conclude that Pelosi's failure to file the underlying lawsuit until August 19[8]8 constituted laches that would deprive Pelosi of any entitlement to mandatory injunctive relief as to the tennis court." *Id.* at 534, 985 P.2d at 1101. Finally, the ICA majority concluded that, inasmuch as Pelosi had moved for a manda-

---

8. The circuit court calculated damages as "the difference between the fair market value of the benefitted property before the breach and the fair market value at the time of the breach."

9. In order to comply with the guidelines of *Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawai'i 115, 869 P.2d 1334 (1994), the circuit court subsequently entered a post-appeal judgment. The post-appeal judgment did not substantively alter the circuit court's September 27, 1996 judgment.

10. The ICA majority presumed, for the purposes of its opinion, that the deeds of the individual defendants to their respective lots in Wailea Ranch incorporated the MM III covenants. *Pelosi II* at 530, n. 3, 985 P.2d at 1097, n. 3. Inasmuch as the defendants have not disputed the ICA's presumption, we assume it to be true.

tory injunction " 'based on the trial transcript and the exhibits admitted in evidence at the trial[,]' ... we cannot conclude that the circuit court abused its discretion when it refused to allow Pelosi a second chance to prove his entitlement to a mandatory injunction." *Id.* at 533–534, 985 P.2d at 1100–1101.

## II. *STANDARDS OF REVIEW*

### A. *Findings Of Fact*

■ Findings of fact will not be disturbed unless clearly erroneous. *See Furukawa v. Honolulu Zoological Society*, 85 Hawai'i 7, 12, 936 P.2d 643, 648, *reconsideration denied*, 85 Hawai'i 196, 940 P.2d 403 (1997) (citation omitted). "A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *State v. Kane*, 87 Hawai'i 71, 74, 951 P.2d 934, 937 (1998); *see also Britt v. United States Auto. Ass'n*, 86 Hawai'i 511, 516, 950 P.2d 695, 700 (1998).

*Kim v. Contractors License Bd.*, 88 Hawai'i 264, 269, 965 P.2d 806, 811 (1998).

### B. *Conclusions Of Law*

■ We review the trial court's [conclusions of law] *de novo* under the right/wrong standard. *Raines v. State*, 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller*, 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992). Thus, a [conclusion of law] "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe*, 51, 53, 77 Hawai'i 51, 881 P.2d 538, 540 (1994) (citation omitted).

*State v. Medeiros*, 89 Hawai'i 361, 364, 973 P.2d 736, 739 (1999) (quoting *Kane*, 87 Hawai'i at 74, 951 P.2d at 937 (quoting *Aickin v. Ocean View Invs. Co.*, 84 Hawai'i 447, 453,

935 P.2d 992, 998 (1997))) (ellipsis points in original).

### C. *Granting Of Equitable Relief*

■ " "The relief granted by a court [in] equity is discretionary and will not be overturned on review unless the [circuit] court abused its discretion by issuing a decision that clearly exceeds the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of the appellant.' " *Aickin*, 84 Hawai'i at 453, 935 P.2d at 998 (quoting *AIG Hawai'i Ins. Co., Inc., v. Bateman*, 82 Hawai'i 453, 457, 923 P.2d 395, 398 (1996) (citations and internal quotation marks omitted)) (brackets in original).

### D. *Refusal To Admit Additional Testimony*

■ "As a general matter, 'permitting or disallowing a party to reopen its case for the purpose of submitting additional evidence is a matter within the discretion of the trial court' and is subject to review for abuse of discretion." *State v. Christian*, 88 Hawai'i 407, 417, 967 P.2d 239, 249 (1998) (quoting *Territory v. Rutherford*, 41 Haw. 554, 558 (1957)); *see also Yee v. Yee*, 48 Haw. 439, 442–43, 404 P.2d 370, 372–73 (1965) (abuse of discretion standard of review applied to circuit judge's denial of a motion for rehearing in a civil case).

## III. *DISCUSSION*

### A. *The ICA And Circuit Court Did Not Err In Applying The Relative Hardship Test To the Present Matter.*

■ Pelosi argues that there should be no exception to the principle enunciated in *Sandstrom, supra*, that "the relative hardships to the parties has no application to the award of final relief" because "the court is enforcing an established right embodied in the covenants." 59 Haw. at 499, 583 P.2d at 978. We disagree.

The *Sandstrom* court held "that *when* either a deliberate and intentional or an assumed-risk violation of a restrictive covenant is shown, a plaintiff is entitled to mandatory injunctive relief regardless of the relative

488

damage which may ensue from the injunction." 59 Haw. at 501, 583 P.2d at 979 (emphasis added). Accordingly, in *Sandstrom,* the court determined—without considering the relative hardships to the parties—that a mandatory injunction was appropriate where the property owners *themselves* added a story to their home in violation of a covenant of which they had actual and constructive notice.[11] *Id.* at 499–501, 583 P.2d at 978–79.

The *Sandstrom* court left open, however, the question of the analysis to be applied in Hawai'i when determining whether to award a mandatory injunction in cases in which a property owner has *not* intentionally violated a restrictive covenant or "taken a chance." Many jurisdictions apply the test of "relative hardship," also called "balancing the equities," to property owners who breach covenants without deliberateness or intent. *See Nonnenmann v. Lucky Stores, Inc.,* 53 Ill. App.3d 509, 10 Ill.Dec. 714, 368 N.E.2d 200, 204 (1977) (noting that a court will apply the relative hardship test except "where encroachment by a defendant was intentional" (citation omitted)); *Horvath v. Gladstone,* 97 Nev. 594, 637 P.2d 531, 533 (1981) (applying a balancing of the equities where the purchaser performed no act in violation of the restrictions); *Hunsicker v. Katz,* 310 Pa.Super. 213, 456 A.2d 576, 580 (1983) (applying the relative hardship test where "the appellees' encroachment was the result of an unintentional mistake"); *Harksen v. Peska,* 581 N.W.2d 170, 176 (S.D.1998) (noting that "[a] critical factor in balancing equities is that the party being enjoined knew that he was violating the covenant"); *Hollis v. Garwall, Inc.,* 137 Wash.2d 683, 974 P.2d 836, 845 (1999) (observing that the doctrine of balancing the equities "is reserved for the innocent defendant who proceeds without knowledge or

warning that his *activity* encroaches upon another's property rights" (emphasis added)); *see also Lange v. Scofield,* 567 So.2d 1299, 1302 (Ala.1990) (applying the relative hardship test to breach of a restrictive covenant); *Swaggerty v. Petersen,* 280 Or. 739, 572 P.2d 1309, 1315 (1977) (recognizing that the relative hardship test will be applied to breach of a restrictive covenant "under the proper circumstances" (emphasis omitted)); *see generally* 9 R. Powell & P. Rohan, *Powell on Real Property* § 60.10[3] at 60–150—60–153 (1997) (hereinafter *Powell* ). This jurisdiction shares the majority view and applies the relative hardship test when a prior landowner has affirmatively violated a restrictive covenant and a subsequent purchaser is asked to bear the burden of a mandatory injunction to remove the violation. Accordingly, we hold that the circuit court did not err in applying the relative hardships test in the present matter.

B. *A Balancing Of The Relative Hardships Was Necessary For The Benefit Of The Individual Defendants.*

■ Pelosi argues that, even if the "relative hardship" test were appropriate, the individual defendants acted intentionally or "took a chance," and should therefore not have benefitted from the application of the test. Pelosi contends that, inasmuch as the individual defendants were aware, from the beginning, of the litigation involving Lot 29, their acquisition of Wailea Ranch lots could not have occurred "innocently." Pelosi's argument that balancing the "relative hardships" was inappropriate is untenable.

■ The ICA majority's application of the term "innocent purchasers" to the individual defendants *is* a bit misleading.[12] While this

11. Likewise, in the two cases relied upon most heavily by the *Sandstrom* court in reaching the conclusion that the relative hardship test should not be considered when a property owner deliberately violates a restriction or intentionally "takes a chance," *Peters v. Davis,* 426 Pa. 231, 231 A.2d 748 (1967), and *McDonough v. W.W. Snow Construction Company,* 131 Vt. 436, 306 A.2d 119 (1973), mandatory injunctions were issued against the original property owners themselves for *intentionally* violating restrictions of which the owners had notice. In fact, subse-

quent cases in the Pennsylvania courts, where *Peters* was decided, have applied the relative hardship doctrine where a property owner has violated a covenant *unintentionally. See Hunsicker v. Katz,* 310 Pa.Super. 213, 456 A.2d 576, 580 (1983). The Vermont courts have not visted the issue.

12. While misleading, as noted in the discussion *supra,* the use of the term "innocent purchasers" did not adversely affect the ICA majority's holding.

jurisdiction has not defined "innocent purchaser," the term has long been understood in other jurisdictions as "one who, by an honest contract or agreement, purchases property or acquires an interest therein, without knowledge, or means of knowledge sufficient to charge him in law with knowledge, of any infirmity in the title of the seller." *Sun Oil Co. v. Broadhead,* 323 So.2d 95, 98 (Miss.1975) (citation and internal quotation signals omitted); *see also A.C. Nelsen Auto Sales v. Turner,* 241 Iowa 927, 44 N.W.2d 36, 47 (1950); *First Nat'l Bank of Omaha v. Provident Finance Co.,* 176 Neb. 45, 125 N.W.2d 78, 85 (1963); *Simon v. Travelers Ins. Cos.,* 85 Misc.2d 264, 378 N.Y.S.2d 870, 872 (N.Y.Civ.Ct.1975); *Jenkins v. Maintenance, Inc.,* 76 N.C.App. 110, 332 S.E.2d 90, 92 (1985). The individual defendants in the present matter *had* constructive notice, by virtue of their deeds, of the MM III covenants. Accordingly, they cannot accurately be referred to as "innocent purchasers."

■ Nonetheless, the circuit court did not err in balancing the equities to determine whether an injunction should be granted for the removal of the roadway and the tennis court. This court applies the relative hardship test when a prior landowner has violated a restrictive covenant and a subsequent purchaser, who took no action regarding the initial violation, is asked to bear the burden of a mandatory injunction to remove the violation. *See* section III.A, *supra.* As noted previously, however, the relative hardship test will not be applied "where a property owner 'deliberately and intentionally violates a valid express restriction running with the land *or intentionally "takes a chance." ' "* *Sandstrom,* 59 Haw. at 500, 583 P.2d at 978 (emphasis in original) (quoting *Peters v. Davis,* 426 Pa. 231, 231 A.2d 748, 752 (1967) (citing, *inter alia, Ventresca v. Ventresca,* 182 Pa.Super. 248, 126 A.2d 515 (1956))).

■ As noted previously, the individual defendants in the present matter *did* have constructive notice of the MM III covenant. The individual defendants did not, however, engage in "a deliberate and intentional" violation. *Id.* at 501, 583 P.2d at 979. Inasmuch as most of the individual defendants did not own property at Wailea Ranch until the roadway and tennis court were complete, they cannot be said to have performed "deliberate or intentional" acts with regard to the creation of the two structures in violation of the MM III covenant.

Furthermore, the individual defendants cannot be said to have "intentionally 'take[n] a chance' " regarding the violation of the covenant. The use of the phrase "take a chance" in *Sandstrom* refers to an affirmative act, not a passive one. *See Sandstrom,* 59 Haw. at 500, 583 P.2d at 978 (declining to apply the relative hardship test where "[a]ppellants took just such a chance in proceeding with construction of the second story of their home"). The use of the phrase "take a chance" in this context traces its origins to *Ventresca, supra.* In *Ventresca,* a property owner, who was notified that he was violating a deed restriction by building a garage too close to the side lines of his lot, told his aggrieved neighbor that "he would take a chance." 126 A.2d at 518. Thus, the "chance" referred to in *Ventresca* concerned the *affirmative* violative act of a property owner. *See also Denniston v. Plaksin,* 72 N.Y.S.2d 353, 354–55 (N.Y.Sup.Ct.1947) (injunction issued against property owner who "deliberately and confessedly decided 'to take a chance' in avoiding the restrictive covenants" by building a multi-family house); *Ingle v. Stubbins,* 240 N.C. 382, 82 S.E.2d 388, 395–96 (1954) (injunction appropriate where property owner built in violation of property restrictions, and so "proceeded to take his chances as to the effect of his conduct upon plaintiffs' rights"); *cf. Gladstone v. Gregory,* 95 Nev. 474, 596 P.2d 491, 495 (1979) (injunction issued against property owner who "assumed the risk" of increased damages by continuing construction after neighbors' objections; equities not balanced where property owner "act[s ] in violation" of a covenant (emphasis added)); *Foster v. Nehls,* 15 Wash. App. 749, 551 P.2d 768, 772 (1976) (property owner " 'assumed the risk' of the outcome" by continuing to build in violation of restrictive covenant).

■ If "taking a chance" were read to refer to passive acts, such as the mere purchase of property with respect to which there

is a preexisting breach of a covenant, the relative hardship test would be applied only in the very limited situation where the property owners had made a mistake of fact. This harsh result does not satisfy the equitable interests of purchasers who have committed no affirmative violative act. As it stands, the relative hardship test will be applied when the rights of a neighbor clash with the rights of a purchaser with notice. In order to protect the neighbor, it should be noted that the state of mind of the purchaser may be weighed in the balancing of the equities. *See Harksen*, 581 N.W.2d at 176.

In the present matter, the individual defendants purchased Wailea Ranch parcels once the covenant had *already* been violated by the commencement, at the very least, of the construction by WRE of the roadway and tennis court, *see supra* at 483–484, 985 P.2d at 1050–1051. At the point of their purchases, it was no longer possible for them to intentionally "take a chance." The individual defendants merit different analysis, therefore, than that imposed by the *Sandstrom* court on property owners who affirmatively originate intentional breaches of restrictive covenants.

The ICA correctly analogized the present matter to that confronted by the Supreme Court of Nevada in *Horvath, supra*. In *Horvath*, the Gregorys, owners of a plot of land subject to a restrictive covenant limiting homes to one story, commenced construction of a second story addition to their home in violation of the covenant. 637 P.2d at 532. While litigation regarding the addition was pending, the Gregorys sold their home to the Horvaths. *Id*. Thereafter, a Nevada district court granted an injunction, ordering that the second story be removed. *Id*. On appeal,

the supreme court observed, "[i]n the present case, which deals with a purchaser *who has performed no act* in violation of the restrictions and who merely purchased a house which contained an existing violation of the restrictions, we perceive no reason to preclude a balancing of equities[.]" *Id*. at 533 (emphasis added).

As in *Horvath*, the individual defendants in the present matter performed no acts with regard to Lot 29, but merely purchased property that contained existing violations.[13] The circuit court was correct, therefore, in applying the relative hardship test to the individual defendants.

### C. Pelosi's Claims For Equitable Relief Were Not Barred By The Doctrine Of Laches.

Pelosi next argues that "the ICA erred in concluding that Pelosi is barred by the doctrine of laches from obtaining mandatory injunctive relief to remove the roadway[.]" The individual defendants argue, on the other hand, that, "contrary to the ICA's conclusion, a laches defense was clearly established" regarding the tennis court. Inasmuch as the doctrine of laches is not applicable to the present matter, Pelosi's contention has merit, and the individual defendants' does not.

■ " 'There are two components to laches, both of which must exist before the doctrine will apply. First, there must have been a delay by the plaintiff in bringing his claim, and that delay must have been unreasonable under the circumstances.' " *Uncle John's of Hawaii v. Mid–Pacific Restaurants*, 71 Haw. 412, 417, 794 P.2d 614, 617 (1990) (quoting *Adair v. Hustace*, 64 Haw.

---

13. Judge Acoba's dissent from the ICA's majority opinion distinguishes *Horvath* on the grounds that when they purchased the property at issue, the Horvaths had no notice regarding the pending litigation. Dissent at 538 n. 5, 985 P.2d at 1105, n. 5. Judge Acoba fails to take account, however, of the fact that at least ten of the individual defendants in the present matter purchased parcels of Wailea Ranch *prior* to the commencement of litigation by Pelosi in August 1988, and after the completion of the roadway.

These ten defendants had no actual or constructive knowledge of the litigation at the time of their purchase. These individual defendants, therefore, stand in the same posture as that occupied by the Horvaths. So long as only one defendant purchased Wailea Ranch property prior to the commencement of litigation by Pelosi, and after the completion of the roadway, the relative hardship test must be applied for the sake of that defendant.

314, 321, 640 P.2d 294, 300 (1982)). "Lapse of time alone does not constitute laches. Since laches is an equitable defense, its application is controlled by equitable considerations." *Yokochi v. Yoshimoto*, 44 Haw. 297, 300, 353 P.2d 820, 823 (1960). "Delay is reasonable if the claim was brought without undue delay after plaintiff knew of the wrong or knew of facts and circumstances sufficient to impute such knowledge to him." *Adair*, 64 Haw. at 321, 640 P.2d at 300.

■ The ICA majority correctly determined that Pelosi was not barred by the doctrine of laches from seeking injunctive relief from the defendants for the removal of the tennis court. The individual defendants argue that Pelosi "failed to notify [them] of his objections to the tennis court until after it was completed, despite knowing of their purchases." This argument is without merit. The first individual defendants purchased Wailea Ranch lots in April 1988, and Pelosi filed suit in August 1988. A delay of four months, considering that Pelosi only learned of the definitive plans for a tennis court in the spring of 1988, can hardly be considered unreasonable.

The individual defendants further argue that Pelosi did not register his objections to the WRE defendants until the tennis court had been completed. The individual defendants appear to have overlooked the fact that, on May 18, 1988, Pelosi's attorney contacted Rink and informed him that Pelosi objected to the planned use of Lot 29. Given that the tennis court was not completed until the summer of 1988, the individual defendants' argument is factually specious.

■ The ICA majority erred, however, in determining that the doctrine of laches bars Pelosi's claim for injunctive relief with regard to the removal of the roadway. "The doctrine of laches reflects the . . . maxim that equity aids the vigilant, not those who slumber on their rights." *Small v. Badenhop*, 67 Haw. 626, 640, 701 P.2d 647, 656, *reconsideration denied*, 68 Haw. 688 (1985) (citation and internal quotation signals omitted) (ellip-

sis points in original). Pelosi did not slumber during the building of the roadway. Indeed, he was actively engaged in trying to uncover the plans for Lot 29. In the fall of 1987, not long after construction had begun on Lot 29, Pelosi requested information from the WRE defendants regarding the planned use of the lot. Pelosi was provided a map indicating that a roadway would be present on Lot 29, but neglecting to identify the type of access to be afforded by the roadway. In late 1987, Pelosi questioned the WRE defendants regarding their plans for the roadway on Lot 29 and was told it was "just a private driveway." Pelosi also attempted to ascertain from the county what it knew of the plans for Lot 29. In both May and August 1988, Pelosi's attorney sent a letter advising Rink of Pelosi's demand that the roadway be removed. Thus, Pelosi cannot be faulted for failing to give notice of his concerns.

Even assuming *arguendo* that Pelosi had full knowledge of the existence of a roadway on Lot 29 as early as the summer of 1987, the fact that Pelosi's complaint was filed just over one year later is of no assistance to the defendants. In the interim, Pelosi took steps to contact the WRE defendants and the county regarding the plans for the roadway, and he also contacted an attorney. These were steps were appropriate, inasmuch as a potential plaintiff must perform a reasonable investigation before filing a claim, *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 11 (1990), and should attempt to employ alternative means of resolving his or her dispute. *Cf. Sylvester v. Animal Emergency Clinic of Oahu*, 72 Haw. 560, 566, 825 P.2d 1053, 1056 (1992) (observing that "the law favors the resolution of controversies through compromise or settlement rather than by litigation"). Pelosi does not seem to have engaged in any unnecessary delay. Furthermore, any delay in filing suit must be attributed at least in part to the WRE defendants themselves, who "were not candid with Pelosi about their plans for the lot." *Pelosi II* at 529, 985 P.2d at 1096. The ICA should not, therefore, have applied the doctrine of laches to Pelosi's delay in filing a lawsuit for

the removal of the roadway on Lot 29. The ICA's misapplication of the doctrine of laches does not, however, change the result that is reached when the relative hardship test is applied to the present matter. *See* section III.D, *infra.*

D. *The ICA Majority Did Not Adequately Balance The Equities Involved In Determining Whether Injunctive Relief Should Have Been Granted For The Removal Of The Tennis Court.*

■ The individual defendants argue that the ICA majority "erred in considering only its view of the laches issue, ignoring the absence of notice to the [individual] Defendants and the Sohns, the lost value the property owners would suffer from removal of the tennis court, the expense of the removal, the unintentional nature of the WRE Defendants' purported violations, and the like." [14] Inasmuch as the ICA majority improperly considered only whether "Pelosi's failure to file the underlying lawsuit until 1998 constituted laches that would deprive Pelosi of . . . mandatory injunctive relief," *Pelosi II,* the individual defendants' argument has merit. However, the ICA majority nevertheless reached the right result.

1. *A mandatory injunction should not be entered for the removal of the roadway.*

■ The equities to be considered regarding the removal of the roadway weigh heavily in favor of the individual defendants. As the circuit court correctly noted, without the roadway on Lot 29, Wailea Ranch would be a landlocked subdivision.[15] Inasmuch as landlocked subdivisions are illegal, *cf.* Hawai'i Revised Statutes (HRS) § 484–5(12) (1993) (providing that an application for registration of subdivided lands must be accompanied by a statement of "the existing provisions for access"), removal of the roadway would render the individual defendants'

homes essentially worthless. Correlatively, those of the individual defendants who inhabit Wailea Ranch would no longer be able to do so. Without the roadway, Wailea Ranch would cease to exist as a residential neighborhood.

Pelosi complains that the roadway on Lot 29 has caused a "tremendous" increase in traffic. He also notes that the gate to the roadway on Lot 29 makes noise as it opens and closes and that it "malfunctions[,] and it opens and closes, opens and closes[,] by itself." The increased noise level caused by the construction of a roadway on Lot 29 may well have resulted in a great annoyance to Pelosi. In addition, the existence of a roadway on Lot 29 violates the MM III covenant and thereby changes the desired tone of the community.

Although substantial harm has been done to Pelosi and to the MM III restrictive covenant by the building of a roadway on Lot 29, removal of the roadway would mean a complete loss for the individual defendants. Removal of the roadway would entail a gross disproportion between the harm to the individual defendants and the benefit to Pelosi. Accordingly, we cannot hold that the circuit court abused its discretion in denying Pelosi's prayer for a removal of the roadway.

2. *A mandatory injunction should be entered for the removal of the tennis court.*

■ Application of the relative hardship test reveals that removal of the tennis court would create a significantly greater benefit to Pelosi than harm to the individual defendants. First, a balancing of the states of mind of the relevant parties weighs in favor of Pelosi. Pelosi objected to the tennis court well before its completion. Pelosi took action, therefore, to prevent the violation of the MM III covenant. The individual defendants, on the other hand, had notice of the MM III covenant in their deeds, and many of

---

14. It should be noted that, as discussed *supra,* the WRE defendants' violations were *not* unintentional.

15. *See* section III.F, *infra,* for a discussion of the availability of an alternative access road.

them purchased Wailea Ranch parcels before the tennis court was completed. The individual defendants chose not, however, to take any action to investigate the proposed uses of Lot 29 and possible violations by the WRE defendants.

Furthermore, Pelosi currently has a tennis court just outside of his bedroom window. He is subjected to the noise of tennis games from morning to evening, seven days a week. As with the roadway, the tennis court violates the MM III covenants and thereby changes the desired tone of the community. Permitting the tennis court to remain would forever change the character of the MM III subdivision.

The individual defendants suggest that removal of the tennis courts would impose both expense and loss of property value upon them. The individual defendants have adduced no evidence, however, of such expense or loss of property value in the event that the tennis court is removed. Accordingly, this court cannot simply assume that removal of the tennis court will cause the defendants to incur harm of any significant magnitude.

Pelosi adduced substantial evidence that the tennis court has caused him harm. The individual defendants, by contrast, have not pointed to *any* evidence that the removal of the tennis court would represent a hardship to them. Accordingly, the ICA did not err in holding that the circuit court abused its discretion in denying Pelosi's prayer for a mandatory injunction requiring the removal of the tennis court.

E. *The ICA Did Not Err In Granting A Mandatory Injunction Where Pelosi Had Already Been Awarded Damages.*

■ The individual defendants contend that, inasmuch as "Pelosi long ago accepted payment of $20,000 for past, present and future damages ... Pelosi would receive im-

proper double recovery [if] a mandatory injunction were issued too." [16] We disagree.

The individual defendants suggest that this court look to *Uncle John's,* 71 Haw. at 417, 794 P.2d at 617, in support of their argument that Pelosi would receive an impermissible double recovery if he were granted an injunction in addition to damages. *Uncle John's,* however, does not concern the awarding of damages for past breaches of restrictive covenants and equitable relief against future breaches, but rather, addresses the inconsistency between awarding damages to a rescinding party for interference with the sale of a franchise and a rescission of the sale for fraud. *Id.* Accordingly, *Uncle John's* is inapposite to the present case.

■ "[I]t is well established that, in a jury trial of an action seeking equitable and legal remedies, the jury decides legal questions and awards legal damages and the court decides equitable questions and awards equitable relief." *Mathewson v. Aloha Airlines, Inc.,* 82 Hawai'i 57, 79 n. 22, 919 P.2d 969, 991 n. 22 (1996); *see also Powell* § 60.07 at 60–116 (observing that, "[i]n most cases, the appropriate relief [for breach of a covenant] has been an injunction against future breaches and, if necessary, damages for past breaches"). In the present matter, the jury awarded Pelosi $20,000 for damages he had already suffered. *See supra* note 16. An injunction would be awarded to enjoin the defendants from any *future* breach. The individual defendants' caution against double recovery is, therefore, unfounded.

F. *The Circuit Court Did Not Abuse Its Discretion In Refusing To Allow Pelosi To Adduce Additional Evidence Subsequent To Trial.*

■ Pelosi argues that "the ICA erred in concluding that the trial court was correct in not allowing Pelosi to adduce additional evidence to establish an alternative access to the Wailea Ranch Estates subdivision." Pe-

16. The individual defendants mischaracterize the award of $20,000, which was awarded by the jury *only* with respect to Pelosi's claim for relief

regarding nuisance. *Pelosi I,* 10 Haw.App. at 434, 876 P.2d at 1326.

losi appears to base his argument on the contention that "whether or not such an alternative access exists is central to a fair balancing of the equities." Pelosi's argument is unpersuasive.

As previously noted, the submission of additional evidence subsequent to trial is permitted or denied in the circuit court's discretion. *See supra*, section II.D. Pelosi has failed to establish that the circuit court's refusal to permit Pelosi to adduce additional evidence "clearly exceed[ed] the bounds of reason or disregarded rules or principles of law or practice[.]" *Aickin, supra*, section II.C (citations and internal quotation marks omitted). In fact, the circuit court's ruling appears to have fallen well within the bounds of reason. Pelosi wished to adduce evidence that an existing fire break road could be upgraded to a residential access roadway for Wailea Ranch. At trial, however, evidence was adduced that the fire break road was *not* owned by the defendants and that the defendants did not have permission to use the road. It would have been reasonable for the circuit court to conclude that, inasmuch as the defendants did not have legal access to the fire break road, additional evidence concerning the adaptability of the road would have been irrelevant. The ICA did not err, therefore, in its refusal to "conclude that the circuit court abused its discretion when it refused to allow Pelosi a second chance to prove his entitlement to a mandatory injunction." *Pelosi II* at 534, 985 P.2d at 1101.

### G. *The ICA Did Not Err In Granting Pelosi Equitable Relief.*

The individual defendants argue that, inasmuch as the circuit court determined that Pelosi had not presented " 'credible evidence' of damage from the tennis court," equitable relief should be denied. The individual defendants appear to draw their argument from the principle that, "[w]here the covenant has lost its beneficial value, equitable relief will be denied." *Powell, supra*, § 60–07 at 60–119. The individual defendants misconstrue the principle, however, by confusing the loss of a covenant's "beneficial value" with a property owner's actual monetary loss.

"Every covenant has a burden to the covenantor and a benefit to the covenantee." *Waikiki Malia Hotel, Inc. v. Kinkai Properties Ltd. Partnership*, 75 Haw. 370, 382, 862 P.2d 1048, 1056 (1993). An individual may suffer a violation of his or her rights without suffering actual damages. It follows, therefore, that a breach of a covenant alone may be grounds for injunctive relief, "even absent a showing of the amount of damage which has in fact been caused by that breach." *Sandstrom*, 59 Haw. at 501, 583 P.2d at 979; *see also Powell, supra*, § 60.07, at 60–120 (injunctive relief may be granted for breach of covenant "*irrespective* of the amount of actual monetary damage" (emphasis added)); *Cordogan v. Union Nat'l Bank of Elgin*, 64 Ill.App.3d 248, 21 Ill.Dec. 18, 380 N.E.2d 1194, 1199 (1978) (observing that " 'it was well settled that equity would entertain bills for injunctions to prevent their breach although the breach would cause no substantial injury' " (citation omitted)).

The defendants have adduced no evidence that the MM III covenant has lost its "beneficial value." Accordingly, we hold that whether or not Pelosi suffered actual monetary damages, the defendants' breach of the MM III covenant alone entitles him to equitable relief.

### IV.  *CONCLUSION*

Based on the foregoing reasoning, and subject to the clarification set forth in this opinion, we affirm the ICA's majority opinion in *Pelosi II*.