198 P.3d 700 (2008)
ROYAL KUNIA COMMUNITY ASSOCIATION, by its BOARD OF DIRECTORS, Plaintiff-Appellee,
v.
Reuben K. NEMOTO and Lorna A. Nemoto, Defendants-Appellants, and
John Does 1-5, Jane Does 1-5; and Doe Entities 1-5, Defendants.
No. 27703.
Intermediate Court of Appeals of Hawai`i.
November 28, 2008.
*701 James J. Stone, Honolulu, and Derwin Hayashi, on the briefs, for defendants-appellants.
Terrance M. Revere and Kapono F.H. Kiakona (Motooka Yamamoto & Revere), on the briefs, Honolulu, for plaintiff-appellee.
WATANABE, PRESIDING J., FOLEY, and FUJISE, JJ.
Opinion of the Court by WATANABE, Presiding J.
In this breach-of-restrictive-covenants case, Reuben K. Nemoto (Reuben) and Lorna A. Nemoto (collectively, the Nemotos) appeal: (1) the Final Judgment entered by the Circuit Court of the First Circuit[1] (circuit court) on April 5, 2006 in favor of Royal Kunia Community Association (Association); (2) the August 30, 2005 order granting summary judgment to the Association (Summary Judgment Order); and (3) numerous related orders[2] entered by the circuit court.
We conclude that the circuit court partly erred in granting summary judgment in favor of the Association. Accordingly, we affirm in part and vacate in part the Summary Judgment Order, vacate the Final Judgment, and remand for further proceedings consistent with this opinion.

BACKGROUND

A.
The Nemotos are the owners of a residence located on a lot (Property) in Royal Kunia, a planned residential community. The Association, a Hawai`i nonprofit corporation, is charged with carrying out the duties, obligations, and responsibilities set forth in the Association's articles of incorporation and bylaws, and the Amended and Restated Declaration of Protective Covenants for Royal *702 Kunia Community, recorded in the Bureau of Conveyances of the State of Hawai`i on March 21, 1994 (Amended Declaration).
The Nemotos acquired their Property pursuant to a "Deed with Reservations, Covenants, Conditions and Restrictions" (Deed) that was executed by Kunia Residential Partners as Grantor and the Nemotos as Grantees on December 26, 2000. The Deed, which was recorded in the State of Hawai`i Bureau of Conveyances on September 13, 2001, expressly provides that the Property is subject to the
Declaration of Protective Covenants for Royal Kunia Community dated April 17, 1989, recorded in the Bureau of Conveyances of the State of Hawaii in Book 23083 at Page 509, as amended ... by [the Amended Declaration], recorded in said Bureau as Document No. 94-049225, as further amended from time to time (collectively, the "Royal Kunia Community Restrictions").
Additionally, the Deed includes specific covenants which the Nemotos agreed to when they signed the Deed as "Grantee":
Grantee's Covenants
AND, in consideration of the foregoing, the Grantee, for the Grantee, the Grantee's heirs, personal representatives, successors and assigns, does hereby covenant and agree as follows:
A. Royal Kunia Community Restrictions. Grantee does hereby accept and approve the "Royal Kunia Community Restrictions" described in said Exhibit A attached hereto. The Grantee does hereby covenant and agree that the granted premises shall be held, occupied and used by the Grantee subject to and in accordance with the terms, covenants, conditions, restrictions and provisions of the Royal Kunia Community Restrictions, and that the Grantee shall pay all assessments as therein provided and shall observe and perform all of the terms, covenants, conditions, restrictions and provisions contained therein. Except as otherwise defined in this Indenture, all capitalized terms used in this Section A, Section C and in Section D below shall have the meanings given to them in the Royal Kunia Community Restrictions. Without limiting the generality of the foregoing, Grantee understands, acknowledges, covenants and agrees that the Royal Kunia Community Restrictions provide, among other things, the following:
1. Any Improvement,[[3]] alteration, repair, landscaping or other work undertaken upon any Lot (including the Property) in a Residential Area, which is or may be Visible from Neighboring Property[[4]] or a Street,[[5]] shall be subject to certain conditions, limitations and restrictions, including without limitation, the requirement that Design Committee[[6]] approval be obtained with respect thereto, all as more particularly set forth in the Royal Kunia Community Restrictions.
....

*703 H. Remedies. The violation or breach of any of the covenants, conditions, agreements or restrictions contained herein shall give the Grantor the right to prosecute a proceeding at law or in equity against the Grantee to prevent or enjoin the Grantee from violating or breaching any of the covenants, conditions, agreements or restrictions, or to cause said violation or breach to be remedied, or to recover damages or other remedies available for such violation or breach. The Grantor shall be entitled to recover fees, costs and expenses as may have been incurred by the Grantor for attorneys (including, without limitation, allocated costs of in-house counsel of Grantor and/or Grantor's partners) in enforcing its rights hereunder.
....
J. Covenants Running with the Land; Duration. Except as otherwise expressly provided herein, each and all of the Grantor's reservations and the Grantee's covenants, agreements, conditions and restrictions contained herein and in the Contract of Sale between Grantor and Grantee are perpetual and intended to run with the land in favor of the Grantor, its successors and assigns, and are expressly binding upon the Property, and each portion thereof, and each successive owner of the property and each person having any right, title or interest in the Property or any portion thereof, unless and until the Grantor shall relinquish and permanently waive any of its rights, but only with respect to the specific rights waived, as evidenced by the recordation of a written notice of such waiver in the Bureau of Conveyances of the State of Hawaii.
(Footnotes added.)
The Amended Declaration includes the following restrictive covenants that are relevant to this appeal:
ARTICLE III
LAND CLASSIFICATIONS AND APPLICABLE RESTRICTIONS
....
Section 3.02 Residential Area: Specific Uses and Restrictions. Each Lot in a Residential Area (except those Lots owned by a Declarant) shall be for the exclusive use and benefit of the Owner thereof, subject, however, to the provisions of this Declaration and to the following:
(a) The rights of the Association or its duly authorized agents, with respect to each Lot, as provided for in Article V;
(b) That no Improvement or other work which in any way alters any Lot from its natural or improved state existing on the date such Lot was first conveyed by a developer Declarant to an Owner, shall be made or done except upon strict compliance with the provisions of Section 4.02;
....
(j) That no truck of more than one ton capacity or boat of any kind shall be kept, placed or maintained upon any Lot or upon any public or private Road so as to be Visible from Neighboring Property or adjoining Streets; provided, however, that the provisions of this paragraph shall not apply to construction equipment maintained for a period not to exceed one year, which is used exclusively in connection with and during the construction of any work or Improvement permitted under Section 4.02;
....
ARTICLE IV
IMPROVEMENT OF PROPERTY
....
Section 4.02 Residential Area: Conditions, Limitations and Restrictions on Improvement. Any Improvement, alteration, repair, landscaping or other work undertaken upon any Lot in a Residential Area, which is or may be Visible from Neighboring Property or a Street, shall be subject to the conditions, limitations and restrictions set forth below:
(a) No construction or reconstruction of any Improvement, alteration, repair, or refinishing of any part of any landscaping within the Designated Landscaped Area or the exterior of an existing *704 Improvement or any other exterior work shall be commenced or continued upon any Lot unless the Owner thereof first obtains the approval of the Design Committee as follows:
(1) the Owner shall submit to the Design Committee preliminary plans for the proposed work prepared by an Architect, unless otherwise permitted by the Design Committee, which plans shall show in detail the nature and dimensions of the proposed Improvement or work;
(2) within forty-five (45) days after submission of the preliminary plans, the Design Committee shall review the plans and return them to the Owner indicating its approval or disapproval. If disapproval is indicated, the general nature of the Design Committee's objections shall also be stated. The Design Committee's failure to make such return within said forty-five day period shall be deemed approval of the preliminary plans;
(3) After review of the preliminary plans has been completed, the Owner shall submit in duplicate to the Design Committee the final plans and specifications for the' [sic] proposed Improvement or work, which shall include where appropriate a plot plan showing easements, set-back lines and contour lines, the location of all existing and/or proposed Improvements, the proposed drainage plan, the location of all proposed utility installations, and any landscape plans, including all trees the Owner intends to plant or remove.... Along with the plans and specifications, the Owner shall submit his [or her] proposed construction or work schedule and shall pay a reasonable fee for the Design Committee's inspection and review;
(4) Within thirty (30) days after the submission of the final plans and specifications, the Design Committee shall either approve or disapprove the same in writing. Any disapproval shall also set forth the reasons for disapproval. If the Design Committee does not act within [sic] thirty-day period, the final plans and specifications shall be deemed approved as submitted. The Design Committee may not disapprove any aspect of the final plans and specifications which was apparent in the preliminary plans and previously approved by the Design Committee;
(5) If the final plans and specifications are disapproved by the Design Committee, the Owner may correct or modify the same to account for the reasons given for disapproval by the Design Committee and resubmit the final plans and specifications within thirty (30) days after receiving the Design Committee's disapproval. Within thirty (30) days after resubmission of the corrected or modified final plans and specifications, the Design Committee shall either approve or disapprove the same in writing in the same manner set forth in paragraph (4) above. If the Design Committee does not act within said thirty-day period, the corrected or modified plans shall be deemed approved as submitted.
(b) Approval of plans and specifications by the Design Committee as aforesaid shall be effective for a period of one (1) year and may be revoked if the work pursuant to such plans and specifications has not commenced within said one-year period or does not proceed in reasonable accordance with the proposed work schedule submitted by the Owner with the plans and specifications....
(c) Upon the completion of any construction, reconstruction, refinishing, alteration, repair or other work for which approved plans and specifications are required pursuant to this section, the Owner shall give written notice thereof to the Design Committee. Within thirty (30) days after such notice is given, the Design Committee shall inspect the Improvements or work in order to determine whether or not there has been substantial compliance with the approved plans and specifications. If the Design Committee finds that there has not been substantial compliance with the plans and specifications, it shall notify the owner of such non-compliance and require the Owner to remedy the same within sixty (60) days after such notice is given. If the Owner fails to remedy such non-compliance within said sixty-day period, the Association may take any and all reasonable steps to remedy the non-compliance or to restore *705 the property to its pre-existing condition and may assess the Owner for all costs and expenses incurred in connection therewith. If the Design Committee does not notify the Owner of any non-compliance within thirty (30) days after receipt of notice of completion from the Owner, the Improvements or work shall be deemed to have been completed in accordance with the approved plans and specifications.
....
(f) Except as is reasonably necessary for and incident to the Improvement, alteration, repair or other work undertaken upon any Lot in a Residential Area, plans for which the Owner has obtained the approval of the Design Committee:
....
(2) there shall be no change in the natural or existing drainage for surface water upon any such Lot; and
....
(h) In the event of any violation of the provisions of this section, the Association may take any and all reasonable steps to restore the Lot and/or Improvements (whether constructed by a Declarant or subsequently added) upon which such violation has occurred to their condition existing prior to the violation and may assess the Owner of such Lot for 120% of all costs and expenses incurred in connection therewith....
(Bold emphases and footnotes added.)

B.
On April 30, 2003, the Nemotos submitted to the Design Committee an "Application for Design Committee Approval" for a concrete slab project. The Nemotos sought to pour concrete over significant parts of their Property for sidewalks around their residence, a future patio extension, a storage shed, and a "turn around area" in the entire front driveway of the Property. They also sought to construct a six-foot-high gate and a six-foot-high wall on the left and right sides, respectively, of their home. On May 24, 2003, the Design Committee approved the Nemotos' request as to the "left driveway extension, left & right sidewalk next to dwelling, [and] rear concrete slab addition to existing lanai." However, the Design Committee specifically disapproved the following portions of the Nemotos' request: "1) Right driveway apron addition. New driveway apron extensions are to be a maximum of 6'0" wide. 2) Return way, gate and storage shed lacks details (design) and specifications." The Design Committee also requested that the Nemotos submit details for the six-foot-high gate, six-foot-high wall, and storage shed they planned to construct on the Property.
In a memorandum submitted to the circuit court, the Nemotos conceded as follows:
On or about July 2, 2003, [they] proceeded with various improvements and extended the landscaping on their plans to the front of the [P]roperty where the concrete apron for the truck was originally requested. This area is now a landscaped area with a Japanese Rock Garden....
On or about July 8, 2003, [they] finished their improvements and landscaping (Japanese Rock Garden) which is supported by a concrete surface below ground level. This concrete is not visible due to the gravel which covers the concrete which is part of the landscaping for the Japanese Rock Garden.
Soon after on or about July 15, 2003, John McKenna[[7]] called Reuben ... and asked if they had finished the improvements and had concrete below the gravel of the landscaping (Japanese Rock Garden) to which Reuben answered "yes". Reuben explained that the concrete was not visible and was below the gravel to the landscaping.
(Footnote added.)
By a letter to the Nemotos dated September 25, 2003, the Association's attorney informed the Nemotos that they had failed to give the Design Committee written notice of the completion of the work for which they *706 had previously sought approval, as required by Section 4.02(c) of the Amended Declaration. The letter demanded that the Nemotos permit the Design "Committee and/or its representatives to inspect the work in order to determine whether or not there has been substantial compliance with the approved plans and specifications" and noted that "the Association and the Design Committee [was] exercising its right of inspection pursuant to Sections 4.02(c) and 5.05 of the [Amended Declaration] and Section VII, Step 5 of the Design Committee Rules."
A November 12, 2003 inspection of the Property revealed that the Nemotos, in disregard of the conditions of the Design Committee's approval of their concrete slab project, had covered the entire front area of their Property with concrete, including the right driveway apron that the Design Committee had expressly disapproved for concrete work. The Nemotos also had concealed the concrete in the disapproved area by covering it with a layer of crushed gravel.

C.
By a letter dated August 6, 2003, the Association requested that the Nemotos take a truck that was parked on their Property to be "weighed at one of the State Certified scale companiesIsland Demo or Toledo Scale" so the Association could confirm whether the truck was in violation of the restrictive covenant in Section 3.02(j) of the Amended Declaration that prohibited any "truck of more than one ton capacity" from being "kept, placed or maintained upon any Lot ... so as to be visible from Neighboring Property or adjoining Streets" (truck covenant). The Association asked the Nemotos to respond "within ten (10) days from the date of this letter to schedule" a weighing. The letter continued: "Should you wish not to weigh the truck as stated previously, and the truck continues to be parked and maintained on your Lot, an inspection will be conducted on 18 August 2003 to ensure the violation has been corrected (i.e.the truck has been removed)."
On September 25, 2003, in another letter, the Association informed the Nemotos that they had failed to contact the general manager of the Association within ten days to schedule a weigh-in, but rather "went ahead with the weigh-in without notifying the general manager." The letter continued as follows:
Your truck manufacturer, Chevrolet, was contacted and provided the Vehicle Identification Number (VIN) that was on the Certificate of Registration you provided the Association previously. The safety inspection certificate that you also provided the Association showed a Tare Wt.[[8]] of your vehicle of 12140 lbs. From your truck's VIN, Chevrolet provided only three possible Gross Vehicle Weight Ratings[[9]] (GVWR) for the make of your truck: Code C7S (GVWR of 14,500 lbs.), Code C3D (GVWR of 14,800 lbs.), and Code C7P (GVWR of 16,000 lbs.). The code is found on a sticker located either on the right front inside of your truck hood or vehicle door. You may wish to confirm this yourself and perhaps allow the Association to *707 confirm the code-type of your truck at the time it inspects your concrete slab project[.]
Based upon the above information, the minimum GVWR option provided by Chevrolet of 14,500 lbs. minus the Tare Wt. of 12,140 lbs. shown on your safety inspection certificate results in the weight of your truck exceeding the one-ton capacity limit as restricted by Section 3.02(j) of the [Declaration] by some 360 lbs.
(Footnotes added.)
By a letter dated February 17, 2004, the Association, through its attorney, informed the Nemotos' attorney that "the inspection of [the Property] ... conducted in November [2005], confirmed that [the Nemotos] had clearly violated the Design Guidelines by paving over areas that were disapproved by the Committee." The letter also informed the Nemotos' attorney that based upon the VIN for the Nemotos' truck and the information provided by the truck's manufacturer, the Association has confirmed "that the truck is over the one-ton capacity limit as restricted by Section 3.02(j)" of the Amended Declaration. The Association demanded that the truck be removed from the Property within seven days of the date of the letter.

D.
On August 2, 2004, the Association filed a complaint in the circuit court based on the Nemotos' alleged violations of the Amended Declaration. The Nemotos answered the complaint on August 31, 2004. The Association filed a motion for summary judgment on December 28, 2004. The Nemotos responded to the motion on February 22, 2005.
On February 24, 2005, the Nemotos filed a "Motion to Compel Discovery, Sanctions, And/Or Other Relief As Deemed Appropriate" (motion to compel discovery). The Nemotos urged the circuit court to compel the Association to produce certain documents and information that they had requested on December 29, 2004. The circuit court instructed the Nemotos to submit to the Association in writing, by March 24, 2005, the requested documents and information. The Association was given until April 7, 2005 to produce those items.
By a letter to the Association's attorney dated March 24, 2005, the Nemotos requested numerous documents and items.[10] On April 1, 2005, the Association wrote to the circuit court objecting to the Nemotos' request on grounds that the Nemotos were "demanding a huge number of additional documents" and that many of the requested items were "beyond what was discussed and ordered in the Court." On April 7, 2005, the Nemotos "received a stack of Documents from [the Association] which were not totally responsive to what Defendant Nemotos' [sic] requested[.]"
On May 12, 2005, following a hearing on March 17, 2005 and an additional hearing on April 13, 2005, the circuit court entered an order granting in part and denying in part the Nemotos' motion to compel discovery. The circuit court determined that whatever was not produced by the Association could not be used by the Association in this case. The circuit court also ordered the Association to "make a final check" for a Design Committee report dated May 8, 2002 and to produce it or declare in writing that it could not be located.
On May 17, 2005, the Nemotos filed a "Motion to: (1) Continue [the Association's] Motion for Summary Judgment; and (2) Reconsider and/or Clarify Order of Defendants *708 Nemotos' Motion to Compel Discovery" (motion to continue). On August 30, 2005, the circuit court entered an order denying the motion to continue.
Also on August 30, 2005, the circuit court entered an order granting the Association's motion for summary judgment. This order: (a) declared that the Nemotos "are in violation of the Association's governing documents and are in continuing violation of the same for so long as the unauthorized concrete pad and over-sized truck that exceeds weight limitation are allowed to remain on their property"; (b) determined that the Association was entitled to an order compelling the Nemotos "to remove the illegal concrete pad and the over-sized truck from their [P]roperty and to allow [the Association] to do so in the event [the Nemotos] fail to comply"; and (c) allowed the Association to submit a request for costs and attorney's fees by way of a non-hearing motion.
On September 13, 2005, the Nemotos filed a motion requesting the circuit court to reconsider its order denying the Nemotos' motion to continue on grounds that the Association had failed to produce documents requested by the Nemotos that were "essential to justify the Nemotos' opposition to [the Association's] Motion for Summary Judgment." After a hearing held on the motion on November 7, 2005, the circuit court denied the motion.
The circuit court issued a Final Judgment that was filed on December 13, 2005. The Nemotos filed their first notice of appeal on January 9, 2006 that was given appeal No. 27703. The Nemotos filed a first Amended Notice of Appeal on January 26, 2006 that was given appeal No. 27734. On February 14, 2006, the circuit court entered an amended judgment that reflected its earlier orders, granted attorneys' fees and costs to the Association, and resolved counterclaims irrelevant to this appeal. Final Judgment was rendered on April 5, 2006. A second Amended Notice of Appeal by the Nemotos was filed on April 20, 2006 in appeal No. 27734. The two appeals (Nos. 27703 and 27734) were consolidated by an order of the Hawai`i Supreme Court entered on May 23, 2006.

ISSUES ON APPEAL
The Nemotos raise the following arguments on appeal:
(1) The circuit court erred in granting summary judgment to the Association;
(2) The Amended Declaration is ambiguous and unenforceable because it does not define "landscaping";
(3) The circuit court erred in concluding that the Nemotos' landscaping violated the Amended Declaration;
(4) The circuit court abused its discretion in denying the Nemotos' motion to continue;
(5) The circuit court abused its discretion in ordering the Nemotos to remove their truck and the concrete base of the Japanese rock garden; and
(6) The circuit court abused its discretion in failing to reconsider its grant of summary judgment to the Association based on newly discovered evidence that showed that the Nemotos' Property was not within a Designated Landscape Area.

DISCUSSION

A. The Circuit Court Partly Erred in Granting Summary Judgment to the Association.

1.
The Nemotos initially argue that the circuit court erred in granting summary judgment to the Association because the evidence the circuit court relied upon consisted of inadmissible hearsay.
The Nemotos first argue that the declaration of Jon McKenna (McKenna), which was attached to the memorandum in support of the Association's motion for summary judgment and served as evidence that the Nemotos' truck exceeded the one-ton capacity limit set forth in the truck covenant, "incorporate[d] the hearsay statement from Chevrolet." In his declaration, McKenna attested that he contacted Chevrolet to obtain the three possible GVWRs for the Nemotos' truck and that "[b]ased upon the information provided by Chevrolet and the minimum GVWR option of 14,500 lbs. minus the Tare *709 Weight of 12,140 lbs. shown on the safety inspection certificate for the subject vehicle, the weight for said vehicle exceeds the one-ton capacity limit as set forth in Section 3.02(j) [of the Amended Declaration]."
As to the "landscaping" violation, the Nemotos argue that the circuit court "granted summary judgment based on unsworn and uncertified documents, including the [Amended Declaration], ..., the By-Laws,..., the Design Committee Rules, ..., Nemoto's Deed, . . ., Nemoto's Application for Design Committee Approval, ..., and a letter dated August 6, 2003, by Albi Mateo, General Manager[.]" (Emphasis in original.)
In Price v. AIG Hawai`i Ins. Co., 107 Hawai`i 106, 111 P.3d 1 (2005), the appellant argued that the circuit court erred in granting summary judgment in favor of the appellee because the depositions offered in support of the appellee's motion for summary judgment were not properly authenticated and were therefore inadmissible. Id. at 110-11, 111 P.3d at 5-6. The Hawai`i Supreme Court rejected this argument on grounds of waiver:
"[T]he rule in this jurisdiction prohibits an appellant from complaining for the first time on appeal of error to which he has acquiesced or to which he failed to object." Okuhara v. Broida, 51 Haw. 253, 255, 456 P.2d 228, 230 (1969) (citations omitted); see also HRS § 641-2 (2004) ("The appellate court need not consider a point that was not presented in the trial court in an appropriate manner."); Craft v. Peebles, 78 Hawai`i 287, 294, 893 P.2d 138, 145 (1995); Hawai`i Rules of Appellate Procedure (HRAP) Rule 28(b)(4)(iii) (2004) (noting that an appellant's opening brief shall state "where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency.").
There are sound reasons for this rule. It is unfair to the trial court to reverse on a ground that no one even suggested might be error. It is unfair to the opposing party, who might have met the argument not made below. Finally, it does not comport with the concept of an orderly and efficient method of administration of justice.
In the instant case, [the appellant] did not object before the circuit court to the depositions that he challenges as inadmissible on appeal.... Additionally, other than his assertion that the circuit court erred in reviewing allegedly inadmissible evidence, [the appellant] does not present any argument as to why this court should overlook his failure to object to the depositions.
Id. at 111, 111 P.3d at 6 (some citations and ellipses omitted). The supreme court held that challenges to papers relating to summary judgment motions that are "raised for the first time on appeal are waived absent plain error." Id. at 112, 111 P.3d at 7.
The rule from Price applies to this case. The Nemotos waived the admissibility issues by not raising them before the circuit court. It would be unfair to examine the admissibility issues for the first time on appeal and then reverse the circuit court's grant of summary judgment on these new grounds.

2.
The Nemotos contend that a genuine issue of material fact exists as to whether their truck violated Section 3.02(j) of the Amended Declaration, thereby precluding the grant of summary judgment to the Association.
This court reviews the circuit court's grant of summary judgment de novo. The standard for granting a motion for summary judgment is well settled:
Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the *710 inferences drawn therefrom in the light most favorable to the party opposing the motion.
Pulawa v. GTE Hawaiian Tel, 112 Hawai`i 3, 10, 143 P.3d 1205, 1212 (2006) (brackets, citations, and internal quotation marks omitted). See also Hawai`i Rules of Civil Procedure (HRCP) Rule 56(c) (2000).
On appeal, an award of summary judgment is reviewed under the same standard applied by the trial court. This involves a three-step analysis:
First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond. Secondly, we determine whether the moving party's showing has established facts which justify a judgment in movant's favor. The motion must stand self-sufficient and cannot succeed because the opposition is weak. When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. Counter-affidavits and declarations need not prove the opposition's case; they suffice if they disclose the existence of a triable issue.
Wailuku Agribusiness Co. v. Ah Sam, 112 Hawai`i 241, 250, 145 P.3d 784, 793 (App. 2006), rev'd on other grounds, 114 Hawai`i 24, 155 P.3d 1125 (2007) (block quotes adjusted; citations, ellipses, emphases, and footnote omitted).
Applying the foregoing three-step analysis, we first examine the pleadings in this case to identify the issues framed by the pleadings to which the motions for and against summary judgment must address. The first count of the Association's complaint alleged that the Nemotos' "parking of an over-sized truck that exceeds weight limitations on their Property violates the provisions of the governing documents including the rules and guidelines of the Design Committee." The Nemotos denied the assertion and therefore placed in issue whether their truck exceeded the one-ton-capacity limit, in violation of the truck covenant.
Second, the Association made a prima facie showing that the truck did exceed the one-ton capacity. In support of its motion for summary judgment, the Association presented evidence that it had determined the truck's weight capacity based on the three GVWRs provided by Chevrolet and the given tare weight.
Finally, the Nemotos showed that a "triable, material factual issue" existed as to the truck's weight capacity. To support their contention that their truck had a capacity of less than one ton, the Nemotos attached an article from Manager's News, a newsletter for Royal Kunia residents, which reminded residents of the truck covenant and provided the following method for calculating a truck's capacity:
To determine if your truck is within/exceeds the one-ton (two thousand pounds) capacity limit refer to the information affixed to your truck's door. Your truck's weight capacity may also be determined by taking the Gross Vehicle Weight Rating (GVWR) less the Gross Vehicle Weight (GVW)[11] found in your registration. If your truck's capacity exceeds what's written in the above provision [Section 3.02(j)], please refrain from parking on the public and private roadways in the community.
(Footnote added.) The Nemotos argue that under this method, the difference between the tare weight found on their truck's registration and the truck's GVWR, puts the truck below the one-ton-capacity limit. In their memorandum in opposition to summary judgment, the Nemotos submitted an October 9, 2003 letter from Frank Agudi of General Motors of Canada, Ltd., which stated that the GVWR of the Nemotos' truck was 14,100 pounds. The Nemotos also submitted a copy of the truck's motor vehicle safety inspection certificate which showed that the truck had a 12,140 tare weight and a 14,1000 GVWR, making the difference between the two weights 1,960 pounds, within the one-ton capacity *711 limit. Reuben also submitted a declaration stating that pursuant to a letter request from the Association, he had his "truck weighed at a State Certified Weigh Station and the weight of the truck was 12,140 pounds," which is equivalent to the truck's tare weight.
On appeal the Association concedes to a "factual issue" but maintains that it is not "material" and that the Nemoto's assessment on the truck's weight is "hypertechnical." These arguments are unpersuasive.
If the truck's capacity exceeded two thousand pounds, then the Nemotos violated the truck covenant. On the other hand, it' the truck has a capacity of one ton or less, there is no violation. Violating the Amended Declaration is central to the Association's claim. Viewing the evidence in the light most favorable to the Nemotos, there is a genuine issue of material fact as to the truck's weight capacity. Therefore, the circuit court erred in granting summary judgment to the Association with regard to this issue.
3.
In acting on the Nemotos' application for approval for their proposed concrete project, the Association's Design Committee disapproved the Nemotos' request to pour concrete for a right driveway apron in the front of their Property. The Nemotos nevertheless poured the concrete onto the disapproved area, covered the concrete with gravel, and built a Japanese rock garden on the disapproved area. On appeal, the Nemotos claim that the restrictive covenants of the Amended Declaration are ambiguous and unenforceable because they "fail to define or even include `landscaping,' and do not expressly prohibit landscaping with a Japanese rock garden."
"[W]hen construing a restrictive covenant, the parties' intentions are normally determined from the language of the deed.... Moreover, substantial doubt or ambiguity is resolved against the person seeking its enforcement." Hiner v. Hoffman, 90 Hawai`i 188, 190, 977 P.2d 878, 880 (1999) (quoting Waikiki Malia Hotel, Inc. v. Kinkai Properties Ltd. P'ship, 75 Haw. 370, 384, 862 P.2d 1048, 1057 (1993) (brackets, citations, and quotation marks omitted)). The Hiner court explained that construing covenants against the drafter or grantor "reinforce[s] the policy favoring careful drafting of covenants because it is not too much to insist that restrictive covenants be carefully drafted to state exactly what is intendedno more and no less." Id. at 195, 977 P.2d at 885 (brackets, citations and quotation marks omitted).
The Deed for the Property specifically provides that the Property is subject to the Amended Declaration, including the following restrictive covenant:
1. Any Improvement, alteration, repair, landscaping or other work undertaken upon any Lot (including the Property) in a Residential Area, which is or may be Visible from Neighboring Property or a Street, shall be subject to certain conditions, limitations and restrictions, including without limitation, the requirement that Design Committee approval be obtained with respect thereto, all as more particularly set forth in the Royal Kunia Community Restrictions.
Section 3.02 of the Amended Declaration provides, in relevant part:

Residential Area: Specific Uses and Restrictions. Each lot in a Residential Area (except those Lots owned by a Declarant) shall be for the exclusive use and benefit of the Owner thereof, subject, however, to the provisions of this Declaration and to the following:
....
(b) That no Improvement or other work which in any away alters any Lot from its natural or improved state existing on the date such Lot was first conveyed by a developer Declarant to an Owner, shall be made or done except upon strict compliance with the provisions of Section 4.02[.]
The relevant part of Section 4.02 provides:

Residential Area: Conditions, Limitations and Restrictions on Improvement. Any Improvement, alteration, repair, landscaping or other work undertaken upon any Lot in a Residential Area, which is or may be Visible from Neighboring Property or a Street, shall be subject to the conditions, *712 limitations and restrictions set forth below:
(a) No construction ... of any Improvement, alteration, repair, or refinishing of any part of any landscaping within ... the exterior of an existing Improvement or any other exterior work shall be commenced or continued upon any Lot unless the Owner thereof first obtains the approval of the Design Committee....
....
(c) Upon the completion of any construction, reconstruction, refinishing, alteration, repair or other work for which approved plans and specifications are required pursuant to this section, the Owner shall give written notice thereof to the Design Committee. Within thirty (30) days after such notice is given, the Design Committee shall inspect the Improvements or work in order to determine whether or not there has been substantial compliance with the approved plans and specification. If the Design Committee finds that there has not been substantial compliance with the plans and specifications, it shall notify the Owner of such non-compliance and require the Owner to remedy the same within sixty (60) days after such notice is given.
....
(f) Except as is reasonably necessary for and incident to the Improvement, alteration, repair or other work undertaken upon any Lot in a Residential Area, plans for which the Owner has obtained the approval of the Design Committee:
....
(2) there shall be no change in the natural or existing drainage for surface water upon any such Lot[.]
Read together, the Deed and Sections 3.02 and 4.02 of the Amended Declaration clearly preclude owners from altering their property unless they strictly comply with Section 4.02, which requires Design Committee approval for the "improvements, alterations, landscaping, or other work" on property that may be visible from neighboring properties or the street. While the Nemotos correctly point out that the Amended Declaration does not define "landscaping[,]" Section 4.02 is not ambiguous. Just because a term is undefined does not signify ambiguity. "As long as the terms of a covenant are not ambiguous, i.e., not capable of being reasonably understood in more ways than one, we are required to interpret the terms according to their plain, ordinary, and accepted sense in common speech." Pelosi v. Wailea Ranch Estates, 10 Haw.App. 424, 436, 876 P.2d 1320, 1327 (1994) (quotation marks and citation omitted). In other words, an ambiguous term is not an undefined term, but one that yields more than one meaning.
To "landscape" means "to change the natural features of (a plot of ground) so as to make it more attractive, as by adding lawns, trees, bushes, etc." Webster's New World Dictionary of the American Language 792 (2d College ed.1976). Although the term encompasses several different activities ranging from cutting grass to changing the flow of a stream, its meaning does not change. The environment is changed for the sake of aesthetic improvement. Accordingly, the restrictive covenant in the Deed and Sections 3.02 and 4.02 of the Amended Declaration are unambiguous and enforceable against the Nemotos.

4.
Section 4.02(c) of the Amended Declaration provides, in part, that
[u]pon the completion of any construction, reconstruction, refinishing, alteration, repair or other work for which approved plans and specifications are required pursuant to this section, the Owner shall give written notice thereof to the Design Committee. Within thirty (30) days after such notice is given, the Design Committee shall inspect the Improvements or work in order to determine whether or not there has been substantial compliance with the approved plans and specification.
The Nemotos insist that Section 4.02(c)'s notice requirement did not apply to the completion of their rock garden because their project involved "landscaping" and Section 4.02(c) does not expressly require notice to the Design Committee of completion of "landscaping."
*713 The Nemotos neglect to mention that their "landscaping" was part of a much larger concrete project for which they had submitted plans and specifications and sought the Design Committee's approval. The Nemotos did not comply with Section 4.02(c)'s notice requirement as to the larger project either. Moreover, in order to complete the rock garden, the Nemotos poured concrete, brought in gravel, and altered their Property. The completion of the rock garden, and particularly the installation of the concrete bed under the gravel of the rock garden, also altered the natural or existing drainage on the Property, which was no longer porous. Therefore, the construction and completion of the rock garden was required to strictly comply with Section 4.02.

B. The Circuit Court Did Not Abuse its Discretion in Denying the Nemotos' Motion to Continue.

The Nemotos argue that the circuit court abused its discretion in denying their motion to continue, which was based on the Association's failure to produce certain documents. However, the Nemotos fail to adequately explain the significance of these missing documents and how these documents would rebut the showing of no genuine issue of material fact.
A "circuit court's decision to deny a request for a continuance pursuant to HRCP Rule 56(f) shall not be reversed absent an abuse of discretion." Associates Fin. Servs. Co. of Hawaii, Inc. v. Richardson, 99 Hawai`i 446, 454, 56 P.3d 748, 756 (App.2002).
The request must demonstrate how postponement of a ruling on the motion will enable him or her, by discovery or other means, to rebut the movants' showing of absence of a genuine issue of fact. An abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.
Id. (quoting Josue v. Isuzu Motors Am., Inc., 87 Hawai`i 413, 416, 958 P.2d 535, 538 (1998)) (brackets omitted).
Given this standard of review, we are unable to conclude that the circuit court abused its discretion in denying the Nemotos' motion to continue in order to complete discovery. See Acoba v. General Tire, Inc., 92 Hawai`i 1, 12, 986 P.2d 288, 299 (1999) (concluding that general request for more time to complete discovery insufficient to allow continuance); Associates, 99 Hawai`i at 454, 56 P.3d at 756 (holding there was no abuse of discretion for denying continuance because movant, appearing pro se, sought discovery on material facts as to waiver defenses). See also 808 Dev., LLC v. Murakami, 111 Hawai`i 349, 363, 141 P.3d 996, 1010 (2006); Josue, 87 Hawai`i at 418, 958 P.2d at 540.

C. The Circuit Court Did Not Abuse its Discretion by Issuing a Mandatory Injunction for Removal of the Concrete Slab.

The Nemotos insist that the circuit court should not have ordered the extraordinary remedy of removal of the concrete base supporting the Japanese rock garden because they had no actual or constructive notice that a Japanese rock garden with a concrete base covered by a layer of gravel was prohibited and Section 4.02(a) of the Amended Declaration only required prior approval from the Design Committee for landscaping in a "Designated Landscape Area." Because they lacked notice, the Nemotos argue, the circuit court erred by failing to consider the relative hardships in granting injunctive relief. They are incorrect.
In Sandstrom v. Larsen, 59 Haw. 491, 583 P.2d 971 (1978), the Sandstroms relied on the advice of an architect in reconstructing their home after it was partially destroyed by fire. Id. at 493, 583 P.2d at 974-75. During the reconstruction, the Sandstroms were reminded of height restrictions in a covenant over the property, but they continued to build in violation of the covenant. Id. at 493, 583 P.2d at 975.
On appeal the Hawai`i Supreme Court rejected the Sandstroms' argument that the court must first consider the relative hardships between the parties before issuing a mandatory injunction. Id. at 498-99, 583 P.2d at 977-78.
[W]here a property owner "deliberately and intentionally violates a valid express *714 restriction running with the land or intentionally `takes a chance', the appropriate remedy is a mandatory injunction to eradicate the violation." (Emphasis added). Peters v. Davis, 426 Pa. 231, 238, 231 A.2d 748, 752 (1967). [The Sandstroms] took just such a chance in proceeding with construction of the second story of their home. Therefore, mandatory injunctive relief was available to appellees without the necessity of consideration by the court below of the relative hardship between the parties.
Id. at 500, 583 P.2d at 978 (emphasis omitted).
The Hawai`i Supreme Court revisited this matter in Pelosi v. Wailea Ranch Estates, 91 Hawai`i 478, 985 P.2d 1045 (1999). The Pelosi court noted that Sandstrom held that a mandatory injunction was appropriate without considering the relative hardships to the parties where the property owners themselves added a story to their home in violation of a covenant of which they had actual and constructive notice. Id. at 488, 985 P.2d at 1055.
The Pelosi court also observed that
in the two cases relied upon most heavily by the Sandstrom court in reaching the conclusion that the relative hardship test should not be considered when a property owner deliberately violates a restriction or intentionally "takes a chance," Peters v. Davis, 426 Pa. 231, 231 A.2d 748 (1967), and McDonough v. W.W. Snow Construction Company, 131 Vt. 436, 306 A.2d 119 (1973), mandatory injunctions were issued against the original property owners themselves for intentionally violating restrictions of which the owners had notice.
Id. at 488 n. 11, 985 P.2d at 1055 n. 11. The Pelosi court went on to discuss an issue unresolved by Sandstrom.
The Sandstrom court left open, however, the question of the analysis to be applied in Hawai`i when determining whether to award a mandatory injunction in cases in which a property owner has not intentionally violated a restrictive covenant or "taken a chance." Many jurisdictions apply the test of "relative hardship," also called "balancing the equities," to property owners who breach covenants without deliberateness or intent. This jurisdiction shares the majority view and applies the relative hardship test when a prior landowner has affirmatively violated a restrictive covenant and a subsequent purchaser is asked to bear the burden of a mandatory injunction to remove the violation.
Id. at 488, 985 P.2d at 1055 (citations omitted).
In the instant case, the Nemotos, at the very least, took the chance of violating the provisions of the Amended Declaration by pouring the concrete slab in an area disapproved by the Design Committee. The Nemotos claim lack of notice because the Amended Declaration and other controlling documents like the Deed do not expressly prohibit the creation of a rock garden. This is beside the point. The Amended Declaration and the Deed clearly set limitations on the Nemotos' construction or alteration of their Property. See Section 4.02. Furthermore, the Design Committee set conditions on the creation of a driveway and turnaround area, a project that called for the pouring of concrete in the same or similar places on the Nemoto property.
The Nemotos cannot claim that they did not violate or take the chance of violating the restrictive provision by pouring concrete for the garden when they disregarded the Design Committee's disapproval of a driveway extension requiring the same or similar concrete slab.
The Nemotos also claim that there was no "governing document" precluding a Japanese rock garden and concrete base and therefore, the Association's "objection" was unreasonable and in bad faith. As discussed above, the provisions of the Amended Declaration regarding the construction, reconstruction, or alteration of the Nemotos' property encompassed the construction of the rock garden. Therefore, this claim is without merit.
Accordingly, the circuit court did not abuse its discretion in issuing a mandatory injunction.

D. The Circuit Court Did Not Abuse its Discretion in Failing to Reconsider its Grant of Summary Judgment Based on "Newly Discovered Evidence."

On appeal, the Nemotos assert that the circuit court ignored evidence that their *715 Property was not within a "Designated Landscaped Area" and thus, was not subject to the notice-of-completion requirements in the Amended Declaration. They claim that the circuit court abused its discretion in denying their motion for reconsideration because the Association failed to produce, among other items, a map of the subdivision that would show the Nemoto Property was not within a "Designated Landscaped Area."
The purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion. Reconsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding. We review a trial court's ruling on a motion for reconsideration under the abuse of discretion standard. An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.
Tagupa v. Tagupa, 108 Hawai`i 459, 465, 121 P.3d 924, 930 (App.2005) (brackets, citations, ellipsis, and quotation marks omitted).
It is unclear to this court why it matters that the Nemotos' Property was not within a "Designated Landscaped Area." That term is defined in the Amended Declaration as "the area described in Section 3.02(d) which may be initially landscaped by contractors and/or employees hired by the developer Declarant and subsequently maintained and irrigated by contractors and/or employees hired by the Association through its Board." Based on the description set forth in Section 3.02(d), a "designated landscaped area" is that part of a lot that faces a street or is along a boundary of a lot which the developer initially landscapes "for the purpose of providing an aesthetically pleasing and harmonious environment within Royal Kunia." How the requested information would be relevant to the summary judgment motion is certainly not evident on the record.
Moreover, the record reflects that the Nemotos had previously raised the argument about the need for a subdivision map showing the designated landscaped areas and they had been informed by the Association that the map was available at the City and County of Honolulu "since the subdivision began." The circuit court did not abuse its discretion in denying the motion for reconsideration.

CONCLUSION
A genuine issue of material fact exists as to whether the Nemotos' truck exceeded a one-ton capacity and was parked on the Nemotos' Property, in violation of Section 3.02(j) of the Amended Declaration, and therefore, the circuit court erred in granting summary judgment on this issue. Accordingly, we vacate the Final Judgment and that part of the circuit court's order that granted summary judgment to the Association on the issue of whether the Nemotos' truck was parked in violation of Section 3.02(j) of the Amended Declaration. We remand this case to the circuit court for further proceedings consistent with this opinion.
NOTES
[1] The Honorable Eden Elizabeth Hifo presided over all proceedings relevant to this appeal.
[2] In their Notice of Appeal filed on January 9, 2006, Notice of Appeal filed on January 27, 2006, and Second Amended Notice of Appeal filed on April 20, 2006, the Nemotos stated that they were appealing the following:

(1) The order granting in part and denying in part the Nemotos' motion to compel discovery, sanctions and/or other relief as deemed appropriate, filed on May 12, 2005;
(2) The order granting the Association's motion for summary judgment, filed on August 30, 2005;
(3) The order denying the Nemotos' motion to continue the Association's motion for summary judgment and reconsider and/or clarify order of the Nemotos' motion to compel discovery, filed on August 30, 2005;
(4) The order granting in part and denying in part the Nemotos' motion seeking: (1) to stay any further action as to the signing of court orders relating to the court hearing on May 25, 2005; (2) to compel production of documents; and (3) other relief as deemed appropriate, filed on October 6, 2005;
(5) The order denying the Nemotos' motion to dismiss for the Association's failure to comply with Section 7.05 of the Amended and Restated Declaration of Protective Covenants for Royal Kunia, filed on December 13, 2005;
(6) The judgment, filed on December 13, 2005;
(7) The order granting in part and denying in part the Nemotos' motion (a) for court resolution of counterclaims for purpose of final judgment and appeal and/or Rule 54(b) relief as to various orders and claims; (b) to stay without bond enforcement of any orders and/or judgment granting and relating to the Association's motion for summary judgment since there may be no automatic stay as to injunctive relief; and (c) for further and/or other relief deemed equitable and/or appropriate, filed on February 14, 2006, which granted summary judgment in favor of the Association as to all of the Nemotos' counterclaims;
(8) The order granting the Association's motion for approval of attorneys' fees and costs, filed on February 14, 2006; and
(9) The Amended Judgment in favor of the Association and against the Nemotos, filed on February 14, 2006.
[3] Pursuant to the Amended Declaration,

"Improvements" shall include buildings, outbuildings, Roads, driveways, parking areas, fences, screens, retaining walls, stairs, decks, hedges, windbreaks, planted trash surrounds, poles, signs and other structures of any type or kind.
[4] The Amended Declaration provides that

"Visible from Neighboring Property" shall mean, with respect to any given object or activity, that such object or activity is or would be in any line of sight originating from any point six feet above the ground level of any adjoining property, excluding contiguous property owned by the Owner of the property involved, but including Common Areas and Streets, assuming that such adjoining property has a ground elevation equal to its actual elevation or the highest elevation of the ground of the property upon which subject object or activity is located, whichever elevation is the lower.
[5] The term "Street" is defined in the Amended Declaration as "any public road or street or any private, paved vehicular way or vehicular access and, in any case, apron."
[6] The term "Design Committee" is defined in the Amended Declaration as "the committee created pursuant to subsection 4.01(f)." The Design Committee consists of not less than three Association members, "at least one of whom shall be an Engineer or an Architect" and its function is to "oversee and exercise control over the improvement of property in Royal Kunia including landscaping plans and designs all for the purpose of maintaining the standards and plan of development in Royal Kunia[.]"
[7] John McKenna was an account executive with the property management company contracted by the Association.
[8] "Tare weight" is the "officially accepted weight of an empty car, vehicle, or container that when subtracted from gross weight yields the net weight of cargo or shipment upon which charges can be calculated[.]" Webster's Third New International Dictionary 2341 (1981).
[9] "Gross vehicle weight rating" (GVWR) is the "maximum allowable weight of the fully loaded vehicle (including passengers and cargo). This numberalong with other weight limits, as well as tire, rim size and inflation pressure dataare shown on the vehicle's Safety Compliance Certificate Label, located on the left front door lock facing or the door latch post pillar. The [Gross Vehicle Weight (GVW)] must never exceed the GVWR." Ford Motor Company Glossary, http://www.fordvehicles.com/help/glossary/index.asp? letter=g (last visited November 20, 2008). The Ford Motor Company Glossary defines "Gross Vehicle Weight" as "the Base Curb Weight plus actual Cargo Weight plus passengers" and notes that "[i]t is important to remember that GVW is not a limit or specification ... it is the actual weight that is obtained when the fully loaded vehicle is driven onto a scale." Id. "Base curb weight" is defined as "the weight of the vehicle including a full tank of fuel and all standard equipment. It does not include passengers, cargo or any optional equipment." Id. "Cargo weight" is defined as "all weight added to the Base Curb Weight, including cargo and optional equipment.... When towing, trailer tongue weight also is part of the Cargo Weight." Id.
[10] The Nemotos requested: (1) certified copies of the Covenant and the Design Committee Rules; (2) a map and table showing all of the lots and unit designations with their corresponding addresses and names of the occupants with a guide "so we will be able to determine from your designations of unit numbers, the identification of property and where the lot is and the corresponding address"; (3) "any and all documents relating to the Lot or United listed in the Table listed as Exhibit `A' [an 18-page list attached to the letter]"; (4) "all of the information and documents regarding the incident including but not limited to the final resolution or handling of the incident and/or violation"; (5) copies of General Manager Monthly Reports, Covenant Manager's Reports, Board of Directors Meeting Minutes, Design Committee Reports, and Design Committee Minutes "for five years prior to November 12, 2003 up to and including the present"; and (6) "any and all documents relating to electronic and/or computer or other means of data storage."
[11] See footnote 9, which includes a definition of "Gross Vehicle Weight." It appears to this court that the newsletter article erroneously equated gross vehicle weight with tare weight. However, since the parties appear to have used the tare weight found on the truck's registration in their calculations of the truck's weight capacity, the error appears to be harmless.